UNITED STATES COURT OF INTERNATIONAL TRADE

_____
)
TRINA SOLAR (U.S.), INC.,                        )          Court No.  22-00321
                                                 )
                         Plaintiffs,             )
           v.                                    )
                                                 )
UNITED STATES,                                   )
                                                 )
                         Defendant.              )
_____)

**COMPLAINT**

Pursuant to Rule 3(a)(2) of the Rules of the United States Court of International Trade,

Plaintiff, Trina Solar (U.S.), Inc. ("TUS"), by and through its counsel, alleges and states as

follows:

**INTRODUCTION**

1.      Plaintiff brings this action to challenge the denial of Protest No. 530122108005

by United States Customs and Border Protection ("CBP").  Protest No. 530122108005 was filed

by TUS on April 13, 2022.

2.      The 234 entries protested consist of 6 different specifications bifacial crystalline

silicon photovoltaic ("CSPV") solar panels that are classified under 8541.40.6015, HTSUS

("Diodes, transistors and similar semiconductor devices; photosensitive semiconductor devices,

including photovoltaic cells whether or not assembled in modules or made up into panels; light-

emitting diodes (LED); mounted piezoelectric crystals; parts thereof: Photosensitive

semiconductor devices, including photovoltaic cells whether or not assembled in modules of

made up into panels; light-emitting diodes (LED): Other diodes: Assembled into modules or

made up into panels"), which were produced and/or exported by TUS's affiliates in Thailand or

Vietnam.  Effective October 16, 2020, the President attempted to withdraw a previous publication that had excluded bifacial solar modules from additional safeguard  duties imposed  on  other CSPV  modules.   Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products), 85 Fed. Reg. 65,639 (Oct. 16, 2021) ("Proclamation 10101") (provided in **Attachment 1**); see also Exclusion of Particular Products from the Solar Products Safeguard Measure, 84 Fed. Reg. 27,684 (USTR Jun. 13, 2019) ("Solar Safeguards Exclusion") (excluding bifacial solar modules from additional safeguard duties effective June 13, 2019) (provided in **Attachment 2**).  As a result, all subject entries were entered by TUS as subject to additional classification 9903.45.25, HTSUS, which caused CBP to collect additional safeguard duties of 20% on TUS's bifacial solar module entries from Thailand and Vietnam that entered between November 21, 2020 and February 15, 2021.  All entries subject to this protest were subsequently incorrectly liquidated at a rate of 20% ad valorem between October 15, 2021 and December 10, 2021.

     3.      On November 16, 2021, the United States Court of International Trade set aside the President's withdrawal of the exclusion of bifacial solar panels from codified in previous versions of the HTSUS as beyond the President's legal authority.  Solar Energy Industries Ass'n et al. v. United States, 45 CIT __, 553 F.Supp3d 1322, 1343 (2021) ("SEIA") (provided in **Attachment 3**); see also J., ECF No. 44, Nov. 16, 2021, entered in Solar Energy Industries Ass'n et al. v. United States, Court No. 20-03941, and Order, ECF No. 47, Dec.7, 2021 entered in Solar Energy Industries Ass'n et al. v. United States, Court No. 20-03941 (provided, respectively, in **Attachments 4 and 5**)  The Court entered judgment on November 16, 2021, setting aside Proclamation 10101 as "null and void" and enjoining the United States, United States Customs

and Border Protection ("CBP"), and its agents, "from taking any further action to effectuate or enforce Proclamation 10101."  Id.  All imported entries contain modules that meet the definition stated in the exclusion listed in U.S. Note 18(c)(iii)(17) to Chapter 99, of the HTSUS Revision 2 (2022) (provided in **Attachment 6**) and in Cargo Systems Messaging Service ("CSMS") Message # 50263965, "Guidance: Section 201 Bifacial Solar Panels Court Order on Presidential Proclamation 10101" (Dec. 2, 2021) (provided in **Attachment 7**).

4.      Because ordinary consumption entries classifiable under 8541.40.6015, HTSUS, are subject to a 0% normal duty rate, TUS's entries of bifacial solar panels should have been liquidated at a normal duty rate of 0%.  As a result, the liquidation of Plaintiff's imported entries at a rate of 20% was unlawful because CBP lacked legal authority to apply additional safeguard duties to imported entries of bifacial solar modules.

5.      On April 13, 2022, TUS protested the liquidation of the imported entries of bifacial solar panels at a rate of 20% via Protest No. 530122108005 on the grounds that Presidential Proclamation 10101 unlawfully withdrew an exclusion from additional safeguard duties for bifacial CSPV solar panels.  See Proclamation 10101, 85 Fed. Reg. at 65,639 (withdrawing an exclusion for bifacial CSPV solar panels from a safeguard measure that was initially imposed on January 23, 2018) (**Attachment 1**), Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes, 83 Fed. Reg. 3,541 (Jan. 23, 2018) ("Proclamation 9693") (imposing a safeguard measure on CSPV modules for a four-year period beginning on February 7, 2018) (provided in **Attachment 8**), Solar Safeguards Exclusion, 84 Fed. Reg. at 27,684 (granting an exclusion from the safeguard measures declared in Proclamation 9693 for bifacial solar panels) (provided in **Attachment 2**).

6.     Also on April 13, 2022, TUS filed a request for accelerated disposition, which was served upon CBP by certified mail on the same date. On April 13, 2022, CBP accepted TUS's request for accelerated disposition.

7.     On May 13, 2022, TUS's Protest No. 530122108005 was deemed denied.

## PARTIES AND STANDING

1.     Plaintiff has standing because TUS is the importer of record of the merchandise that is the subject of this action. TUS supplies bifacial solar panels to solar installers throughout the United States.

2.     The entries subject to this action were liquidated between October 15, 2021 and December 10, 2021. Plaintiff timely filed its protest of CBP's liquidation within 180 days of the earliest liquidation (i.e., October 15, 2021) on April 13, 2022. Plaintiff's protest was deemed denied on May 13, 2022.

3.     Plaintiff therefore has standing to bring this action pursuant to 28 U.S.C. § 2631(a) because TUS is the party that filed the protest pursuant to Section 514 of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1514.

4.     Defendant the United States, CBP, is the party that denied the protests contested herein and is the statutory defendant under 28 U.S.C. § 2631(A).

5.     TUS paid all these unlawfully collected safeguard duties on entries that are the subject of this appeal.

## JURISDICTION

6.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1581(a) as this civil action contests CBP's denial of Plaintiff's protest.

## TIMELINESS

7.      Protests must be filed within 180 days of liquidation.  19 U.S.C. § 1514(c)(3); 19

C.F.R. § 174.12(e)(2).

8.      The entries subject to this action were liquidated between October 15, 2021 and

December 10, 2021.  Plaintiff timely filed its protest of CBP's liquidation within 180 days of the

earliest liquidation (i.e., October 15, 2021) on April 13, 2022.  On the same date, Plaintiff filed a

request for accelerated disposition in accordance with 19 U.S.C. § 1515(b) and 19 C.F.R.

§ 174.22.

9.      Plaintiff's protest with request for accelerated disposition was deemed denied on

May 13, 2022.  See 19 U.S.C. § 1515(b).  This action was timely commenced within 180 days of

the date of denial of the protest by operation of law under the provisions of 19 U.S.C. § 1515(b).

See 28 U.S.C. § 2636(a)(2).  Summons, ECF No. 1, Nov. 4, 2022.

## BACKGROUND AND PROCEDURAL HISTORY

### MERCHANDISE AT ISSUE

10.     The merchandise at issue are bifacial solar modules, as defined in the exclusion

from a safeguard measure that was initially imposed on January 23, 2018, as listed in U.S. Note

18(c)(iii)(17) to Chapter 99, of the HTSUS Revision 2 (2022).

11.     All subject merchandise were imported by TUS and entered during the period

between November 21, 2020 and February 15, 2021.  The entries of Thai origin were produced

and exported from Thailand by one of the following two producer/exporters:  (1) Tiger Solar

Co., Ltd.; or (2) Trina Solar Science & Tech Thai, Ltd.  The entries of Vietnamese origin were

produced and/or exported by Vina Solar Technology Co., Ltd.

**PROTEST**

12.     On May 16, 2022, TUS timely filed Protest No. 530122108005.  In the protest,
TUS explained that the entries of imported merchandise include 6 specifications of bifacial solar
modules produced and/or exported by TUS's affiliates in Thailand or Vietnam.  Id.  TUS further
explained that it provided information that would allow CBP to identify all entries subject to the
protest as bifacial solar modules.  Id.  Specifically, TUS stated that all entries subject to the
protest could be identified as meeting the definition of "bifacial solar modules" contained in the
exclusion because all product codes identified on the commercial invoices and packing lists for
all entries subject to this protest are bifacial solar modules.  Id.

13.     Additionally, TUS made clear in its protest that the documentation included in
each entry would allow CBP to identify that all imported modules subject to the protest as
bifacial modules based on the portion of the product code identified in the "Description of
Goods" Field of the commercial invoice and the "Quantities and Descriptions" field of the
packing list.  Id.  TUS provided a key to the "Product Code Naming Rule" used across all of
Trina's affiliates that produced and/or exported the entries of bifacial solar modules subject to
TUS's protest.  Id.

14.     In its protest, TUS provided a complete listing of the bifacial module product
types that were the subject of its protest at Exhibit 8 of its protest.  Id.  TUS provided CBP
product specification data sheets for each of the eight bifacial solar module product codes
identified in entries that were the subject the protest.  Id.

15.     In its protest, TUS further explained that, as reflected in each product data sheet
provided, each of the eight identified module types is identified as "bifacial," and each
specification data sheet reflects the electrical characteristics of both the front and rear sides of the

panel.  Id.  In other words, TUS clarified that CBP could identify each entry as containing a bifacial module based on the module type identified on the commercial invoices and packing lists.  Id.  The commercial invoices and packing lists identify the bifacial product specifications contained in the entry by stating one of the eight above-referenced product specifications.  TUS further explained that CBP could cross-reference the identified module specification against the product list provided with its protest and the specification data sheets provided with its protest.  Id.

16.     TUS provided sample documentation for a sample entry of the merchandise to provide an example of how CBP could identify each entry as containing bifacial modules.  Id.

17.     In the alternative, TUS argued that two entries of bifacial solar panels, Entry Nos. FS220060800 and FS220059752, should not have been liquidated at 20% (i.e., the rate applicable for CSPV entries subject to additional classification 9903.45.25 entered between February 7, 2020 and February 6, 2021) even if they had been rightfully subject to additional safeguard duties (i.e., subject to safeguard duties because the SEIA case is subject to an appeal) because these two entries were entered between February 7, 2021 and February 6, 2022.  Id.

18.     In other words, TUS argued that, because the Court found in SEIA that the increase in the safeguard duties during the period between February 7, 2021 and February 6, 2022 were unlawfully increased from 15% to 18% by Proclamation 10101, CBP should refund the difference (i.e., 5%) between the *ad valorem rate*, as entered (i.e., 20%), and the applicable safeguard duty rate in effect for the same period stated in Proclamation 9693 (i.e., 15%) for Entry Nos. FS220060800 and FS220059752 because Proclamation 9693 was the only validly promulgated proclamation establishing the applicable additional safeguard duty rate.  Id.

19.     Finally, as yet another alternative, TUS argued that, even if CBP determines that

these entries of bifacial solar modules should have been liquidated as subject to additional classification 9903.45.25, HTSUS (i.e., subject to safeguard duties because the SEIA case is subject to an appeal), CBP nonetheless should refund the difference (i.e., 2%) between *ad valorem rate*, as entered (i.e., 20%), and the applicable safeguard duty rate in effect for the same period as stated in Proclamation 10101 (i.e., 18%) for Entry Nos. FS220060800 and FS220059752.  Id.

20.     On April 13, 2021, CBP accepted Plaintiff's request for accelerated disposition pursuant to Section 515 of the Tariff Act.

21.     On May 6, 2022, CBP denied Protest No. 530122108005 reasoning as follows:

CIT hearing currently under way on bifacial solar panels which this protest concerns.  IOR did not want to remove the accelerated disposition flag on this protest.

22.     This appeal followed.

23.     The entries covered by this appeal are covered by a separate action titled Trina Solar (U.S.), Inc. v. United States et al., Court No. 22-00306 ("TUS § 1581(i) Case"), over which the Court has jurisdiction pursuant to 28 U.S.C. § 1581(i)(1)(B)-(D). TUS filed Protest No. 530122108005, and this action to challenge the liquidation of the protested entries that had liquidated as of the date the Court enjoined Defendants and their agents from taking any further action to effectuate or enforce Proclamation 10101, in case the Court:  (a) partially dismisses the TUS § 1581(i) Case with respect to the protested entries on jurisdictional grounds; or (b) determines that Defendants legally cannot reliquidate entries that were liquidated before the date the injunction was issued in the SEIA case.

24.     Consequently, TUS intends to seek dismissal of this action in accordance

with Rule 41 in the event that the Court:  (a) does not partially dismiss the TUS § 1581(i) Case with respect to the protested entries on jurisdictional grounds; or (b) orders Defendants to reliquidate the protested entries in the TUS (i) Case.

## ISSUANCE OF THE SOLAR SAFEGUARD MEASURE

25.      On January 23, 2018, President Trump issued Proclamation 9693, which imposed a safeguard measure under Section 203(a)(3) of the Trade Act on certain CSPV products. Proclamation 9693, 83 Fed. Reg. at 3541.  See **Attachment 8**.  Proclamation 9693 imposed a tariff on CSPV modules for a four-year period beginning on February 7, 2018.  Id.  Relevant here, the president imposed a tariff-rate quota on CSPV cells and a tariff on CSPV modules at the following rates:

> If entered during the period from February 7, 2018 through February 6, 2019 ...................................................................................................30%
>
> If entered during the period from February 7, 2019 through February 6, 2020 ...................................................................................................25%
>
> If entered during the period from February 7, 2020 through February 6, 2021 ...................................................................................................20%
>
> If entered during the period from February 7, 2021 through February 6, 2022 ...................................................................................................15%.

Id. at 3,548.

## EXCLUSION OF BIFACIAL CSPV MODULES

26.      Proclamation 9693 also authorized the USTR to establish a process to exclude certain products from the solar safeguard measure.   Id. at 3,543-44.  On February 14, 2018, USTR published a notice detailing the procedures to request a product exclusion.  Solar Safeguards Exclusion, 83 Fed. Reg. at 6,670.  USTR stated that it would "evaluate each request

on a case-by-case basis," and "grant only those exclusions that do not undermine the objectives of the safeguard measures."  Id. at 6,671.  The USTR notice establishing the exclusion process did not include any reference to the possibility that a granted exclusion could be modified or withdrawn at a later date.

27.     Following receipt of safeguard exclusion requests from various parties, USTR published a notice on June 13, 2019, granting a prospective exclusion from the safeguard action for "bifacial solar panels that absorb light and generate electricity on each side of the panel and that consist of only bifacial solar cells that absorb light and generate electricity on each side of the cells."  Solar Safeguards Exclusion, 84 Fed. Reg. at 27,685 (**Attachment 2**).   USTR stated that it had evaluated the factors outlined in the February 14, 2018 notice, including the requirement that the exclusion not undermine the objectives of the safeguard measures.  See id. at 27,684. USTR's notice did not include any indication that the granted exclusion might be revisited, modified, or withdrawn in the future.

## USTR ATTEMPTS TO WITHDRAW THE BIFACIAL CSPV MODULE EXCLUION AND RESULTING LITIGATION

28.     USTR attempted to withdraw the exclusion of bifacial modules on October 9, 2019 and again on April 17, 2020.   Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure, 84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) ("First Withdrawal"); Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) ("Second Withdrawal").

29.     Both attempted withdrawals were challenged before the CIT in Invenergy Renewables LLC v. United States, with consumers, purchasers, and importers of utility-grade bifacial solar panels demonstrating that "the importation of bifacial solar panels does not harm domestic producers because domestic producers do not produce utility-scale bifacial solar panels;

10

{and} thus oppos{ing} safeguard duties that they contend increase the cost of these bifacial solar panels." Invenergy Renewables LLC v. United States, 43 CIT __, __, 422 F. Supp. 3d 1255, 1264 (2019) ("*Invenergy I*"). The CIT ultimately enjoined both withdrawals. See id. at 1294; Invenergy Renewables LLC v. United States, 44 CIT __, __, 476 F. Supp. 3d 1323, 1356-57 (2020) ("Invenergy IV").

30.    The CIT held that the First Withdrawal violated the Administrative Procedure Act ("APA") and vacated that notice on October 15, 2020. Invenergy IV, 476 F.Supp.3d at 1340. Moreover, the CIT concluded that the Second Withdrawal also violated the APA and "exceeded both the authority granted to the President in Section 203 and the authority delegated by the President to USTR in *Proclamation 9693*." Invenergy Renewables LLC v. United States, 45 CIT __, __, 552 F. Supp. 3d 1382, 1398 (2021). The CIT vacated the Second Withdrawal on November 17, 2021. Id. The CIT's judgment holding the First Withdrawal and Second Withdrawal unlawful was not appealed.

**PRESIDENTIAL PROCLAMATION 10101**

31.    Following the CIT's expansion of its preliminary injunction to include the Second Withdrawal in Invenergy IV, President Trump issued Proclamation 10101 on October 10, 2020, which was published on October 16, 2020. Proclamation 10101, 85 Fed. Reg. at 65,639 (**Attachment 1**). Proclamation 10101 again withdrew the bifacial module exclusion, thereby re-imposing safeguard duties on bifacial modules. Proclamation 10101 also prospectively increased the safeguard duties on CSPV modules declared under Proclamation 9693 from 15 percent to 18 percent in the fourth year of the safeguard measure (i.e., February 7, 2021 through February 6, 2022). Id. at 65,640-42. The stated rationale for increasing the safeguard duties in the fourth year of the safeguard measure was that the bifacial module exclusion had supposedly

11

impaired the remedial effect on the original safeguard measure.  Id.  Proclamation 10101 had

an effective date of October 25, 2020.  See id. at 65,641.

32.    President Trump cited Section 204(b)(1)(B) of the Trade Act, 19 U.S.C.

§ 2254(b)(1)(B), as authority for the action taken in Proclamation 10101.  Section 204(b)(1)(B)

allows the President to reduce, modify, or terminate Section 201 safeguard measures if he

"determines after a majority of the representatives of the domestic industry submits to the President

a petition requesting such reduction, modification, or termination on such basis, that the domestic

industry has made a positive adjustment to import competition."  19 U.S.C. § 2254(b)(1)(B).

The President asserted that he had received a petition from the domestic industry requesting the

modifications to the safeguard measure, and he found that the domestic industry "has begun to

make positive adjustments to import competition."  Proclamation 10101, 85 Fed. Reg. at 65,640.

The President did not identify or make available the petition to which he referred.  See id.

33.    The Invenergy plaintiffs sought to incorporate a challenge to Proclamation 10101

into their ongoing litigation and to benefit from the CIT's previously issued preliminary

injunction enjoining USTR from withdrawing the bifacial exclusion.  See Invenergy Renewables

LLC v. United States, 44 CIT __, __, 482 F. Supp. 3d 1344, 1351 (2020) ("Invenergy V").  The

CIT denied both requests, finding that plaintiffs' Proclamation 10101 claims "involve{} actions

undertaken by the President, a party not implicated in Plaintiffs' complaints or supplemental

complaints {in the Invenergy litigation} and seek relief against the President not contemplated by

Plaintiffs' prior pleadings."  Id. at 1,353.  In short, the CIT found that the "core issues are

different."  Id.  Thereafter, SEIA and other solar industry plaintiffs initiated a new challenge

against Proclamation 10101 in SEIA v. United States, 20-03941.  Compl., ECF No. 2, Dec. 29,

2020 filed in Solar Energy Indus. Ass'n v. United States, Court No. 20-03941 ("SEIA Compl.")

## THE CIT'S OPINION AND ORDER IN <u>SEIA</u> DECLARING PROCLAMATION 10101 TO BE "NULL AND VOID"

34. The <u>SEIA</u> plaintiffs challenged <u>Proclamation 10101</u> as unlawful for three reasons: (1) (1) <u>Proclamation 10101</u> violates Section 204(b)(1)(B) of the Trade Act because the President (a) did not receive the petition from a majority of the representatives of the domestic industry required by the statute before action can be taken pursuant to Section 204(b)(1)(B), (b) failed to make the finding required by Section 204(b)(1)(B) – that "the domestic industry has made a positive adjustment to import competition" – in order to modify a safeguard measure, and (c) unlawfully utilized Section 204(b)(1)(B) to increase, rather than decrease, trade restrictions; (2) <u>Proclamation 10101</u> violates Section 203(e)(7)(A) of the Trade Act because it reimposed safeguard duties on bifacial modules less than two years after such duties were lifted by the exclusion granted in June 2019; and (3) <u>Proclamation 10101</u> violates Section 201(a) of the Trade Act because the President failed to weigh the costs and benefits of withdrawing the exclusion for bifacial modules and increasing the safeguard duty rate during the fourth year of the measure. <u>See SEIA Compl</u>.  The <u>SEIA</u> plaintiffs sought both a declaratory judgment that <u>Proclamation 10101</u> is unlawful and an injunction against its enforcement.  <u>Id.</u>  Certain <u>SEIA</u> plaintiffs who had been importers of record with regard to entries on which safeguard tariffs were unlawfully collected requested refunds, with interest, of all increased safeguard duties collected from them pursuant to <u>Proclamation 10101</u>.  <u>Id.</u>

35. The Court agreed with the <u>SEIA</u> plaintiffs that <u>Proclamation 10101</u> violated Section 204(b)(1)(B) because it restricts, rather than liberalizes, trade.  The CIT held that interpreting Section 204(b)(1)(B) to permit both trade-restricting and trade-liberalizing modifications would run counter to the detailed statutory scheme.  <u>SEIA</u>, 553 F. Supp. 3d at 1342 (**Attachment 3**).  Specifically, the CIT observed:

> There is no indication in the statute that Congress intended Section 204 to provide a loophole for the institution of harsher safeguards without the standard procedural restrictions. Conversely, there is every indication that the section was intended to provide an escape hatch from those safeguards where domestic industry has adequately adapted to import competition.

Id. at 30. Accordingly, the CIT concluded that Section 204(b)(1)(B) must be read to authorize only trade-liberalizing modifications to existing safeguard measures because interpreting the statute to permit trade-restricting modifications would undermine the broader statutory scheme. Id. (quoting United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988))

36.    The CIT thus held that Proclamation 10101's withdrawal of the bifacial module exclusion and its increase of the safeguard duties on CSPV modules constituted both a "clear misconstruction of the governing statute" and an "action outside the President's delegated authority." Id. at 1,343 (quoting Maple Leaf Fish Co., 762 F.2d at 89).   Accordingly, the CIT entered judgment in favor of the SEIA plaintiffs, and ordered the refund to the *SEIA* plaintiffs of "all safeguard duties collected pursuant to Proclamation 10101, with interest."    Id. at 1,343-44 (underline in original).

37.    In addition to rescinding the exclusion for bifacial solar modules, Proclamation 10101 also increased the applicable safeguard duty rate on non-bifacial CSPV modules entered during the period from February 7, 2021 through February 6, 2022, from 15 percent to 18 percent. Proclamation 10101, 85 Fed. Reg. at 65,642 (**Attachment 1**).

38.    On November 16, 2021, the United States Court of International Trade ("CIT") set aside the president's withdrawal of the exclusion of bifacial solar panels codified in previous versions of the HTSUS and the increase in safeguard duties from 15 percent to 18 percent on CSPV modules entered between February 7, 2021 and February 6, 2022 as "an action outside the President's legal authority," enjoined United States Customs and Border Protection ("CBP")

14

from enforcing Proclamation 10101, and ordered that safeguard duties collected to Proclamation 10101 be refunded with interest. SEIA, 45 CIT at __, 553 F.Supp.3d at 134344. Specifically, the CIT reasoned that Section 204(b)(1)(B) of the Trade Act of 1974, as codified in 19 U.S.C. § 2254(b)(1)(B), must be construed to "authorize only trade-liberalizing modifications to safeguard measures." Id., 45 CIT at __, 553 F.Supp.3d at 1343. The Court concluded that Proclamation 10101 is a "trade-restricting" modification to the president's initial action authorizing safeguard duties because it withdrew the exclusion of bifacial solar panels and increased the safeguard duties on CSPV modules authorized in the initial safeguard action. Id.

39.     The CIT entered judgment on November 16, 2021, setting aside Proclamation 10101 as "null and void" and enjoining the United States, United States Customs and Border Protection ("CBP"), and its agents, "from taking any further action to effectuate or enforce Proclamation 10101." J., ECF No. 44, Nov. 16, 2021, entered in Solar Energy Indust. Ass'n et al. v. United States, Court No. 20-03941 (**Attachment 4**).

40.     Acting pursuant to the now null-and-void Proclamation 10101, CBP had required TUS to pay: (a) a 20% safeguard tariff on imports of bifacial CSPV modules effective October 25, 2020 through February 6, 2021; and (b) a 18% safeguard tariff on all imports of CSPV modules (including both bifacial and monofacial modules) effective February 7, 2021. If Proclamation 10101 had not been in force during these periods of time: (a) bifacial module imports would have been assessed no safeguard tariff from October 25, 2020 through November 16, 2021; and (b) monofacial module imports would have been assessed a 15% safeguard tariff, not a 18% safeguard tariff, from February 7, 2021 through November 16, 2021.

41.     In order to effectuate the CIT's judgment in SEIA v. United States, CBP issued CSMS # 50263965 on December 2, 2021. See **Attachment 7**. CSMS # 50263965 provides

that the exclusion of bifacial solar panels from the safeguard measures had been reinstated, and

that the "functionality for the acceptance of solar cells (over quota only) and modules at the 15

percent duty rate . . . was available in the Automated Commercial Environment (ACE) as of 7 am

eastern standard time, November 16, 2021." Id.

42.    On December 7, 2021, the Court enjoined CBP and the Office of the United

States Trade Representative ("USTR"), during the pendency of Solar Energy Indust. Ass'n et al.

v. United States, Court No. 20-03941, including any appeals, from:

> "issuing instructions to liquidate or making or permitting liquidation of any
> entries of merchandise subject to the modifications to the safeguard measures on
> {CSPV} cells, whether or not partially or fully assembled into other products,
> imposed by Proclamation 10101 pending final and conclusive disposition of this
> action, including all appeals."

Order, ECF No. 47, issued in SEIA, Court No. 20-03941 (**Attachment 5**).

43.    The unlawful safeguard duties collected by CBP between October 25, 2020 and

November 16, 2021 are substantial and impose a continuing financial burden on TUS as the

importer of record ("IOR") who paid these duties and incurred other attendant costs.

44.    On January 14, 2022, the United States and CBP filed a notice of appeal of the

opinion, judgment, and order docketed in Solar Energy Indust. Ass'n et al. v. United States,

Court No. 20-03941. Notice of Appeal, ECF No. 48, Jan. 14, 2022, filed in Solar Energy Indust.

Ass'n et al. v. United States, Court No. 20-03941. That appeal was docketed on January 24,

2022, by the United States Court of Appeals for the Federal Circuit. Appeal of Slip Op. 21-154

and J., ECF No. 49, Jan. 24, 2022, filed in Solar Energy Indust. Ass'n et al. v. United States,

Court No. 20-03941.

45.    On August 11, 2022, the United States and CBP notified the Court in Solar

Energy Indust. Ass'n et al. v. United States, Court No. 20-03941, that CBP had inadvertently

liquidated entries in a manner contrary to the Injunction Order. Specifically, CBP stated that it

inadvertently liquidated certain entries of solar products that were subject to the Injunction Order that were unliquidated as of December 7, 2021.  See Def.'s Notice of Inadvertent Liquidations at 2, ECF No. 50, filed in Solar Energy Indust. Ass'n et al. v. United States, Court No. 20-03941 ("Notice of Inadvertent Liquidations").  CBP further stated that it identified approximately 160 entries that were liquidated after December 7, 2021, and for which it is clear based on entry date and liquidated tariff classification alone that the entries would be subject to Proclamation 10101, which should not have been liquidated.  Id. at 3.  It is clear from CBP's description that these entries were non-bifacial CSPV modules entered between February 7, 2021 and February 6, 2022, which were wrongfully liquidated at a duty rate of 18%.  CBP asserts that it voided these liquidations.  Id.

46.    CBP stated that some of the liquidations in contravention of the Injunction Order affected entries that were subject to protests by TUS that were entered after December 7, 2021. CBP further implied that it would rectify the wrongful liquidations of TUS's entries by voiding only TUS's entries that were subject to Proclamation 10101 that were entered after December 7, 2021 by voiding the liquidations.  Id. at 4.

47.    CBP further asserted that, for at least some entries that were liquidated after December 7, 2021 contrary to the Injunction Order, it was undertaking a manual review of the relevant supporting documentation and evidence provided by the importer to determine whether entries entered between October 25, 2020 and February 6, 2021 the entry would only be covered by Proclamation 10101 if it included merchandise qualifying for exclusion for bifacial solar panels that Proclamation 10101 wrongfully rescinded.  Id.  In other words, as of August 11, 2022, CBP had not taken any action with respect to entries of bifacial solar modules entered between October 25, 2020 and February 6, 2021 that were the subject of Protest No.

530122108005.  As a result, as of August 11, 2022, all entries of bifacial solar modules that included in Protest No. 530122108005 were wrongfully liquidated at a duty rate that included 20% *ad valorem* additional safeguard duties.

<u>**ISSUES PRESENTED BY THE ACTION AND PLAINTIFFS' STATEMENT OF CLAIMS**</u>

**COUNT ONE**

48.     Paragraphs one through forty-seven of this Complaint are hereby incorporated by reference.

49.     A presidential action may be set aside if the President's action involves "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." <u>Silfab Solar, Inc. v. United States</u>, 892 F.3d 1340, 1346 (Fed. Cir. 2018); <u>Maple Leaf Fish Co. v. United States</u>, 762 F.2d 86, 89 (Fed. Cir. 1985); <u>Motion Systems Corp. v. Bush</u>, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (stating that court may consider whether the President has violated an explicit statutory mandate).

50.     For the reasons set forth in this Complaint, TUS was unlawfully required to pay additional safeguard duties pursuant to <u>Proclamation 10101</u>, including safeguard duties on the 234 protested entries of bifacial modules effective October 25, 2020 through November 16, 2021.

51.     The CIT found that "{b}ecause Section 204(b)(1)(B) permits only trade-liberalizing modifications to existing safeguard measures," <u>Proclamation 10101</u> "clearly misconstrued the reach of Section 204(b)(1)(B) of the Trade Act, and thus constituted an action outside the President's delegated authority." <u>SEIA</u>, 553 F. Supp. 3d at 1343.  Accordingly, the CIT has declared <u>Proclamation 10101</u> "null and void." <u>J.</u>, ECF No. 44, Nov. 16, 2021, entered in <u>Solar Energy Indust. Ass'n et al. v. United States</u>, Court No. 20-03941.

52.    The withdrawal of the exclusion that was applicable to bifacial CSPV panels—as stated in Proclamation 10101—was unlawful.  The 234 entries of bifacial CSPV panels entered by TUS as classifiable under 8541.40.6015, HTSUS, and additional classification 9903.45.25, HTSUS should not have been liquidated a duty rate of 20% *ad valorem*.

53.    CBP's liquidation of the protested entries, as entered (i.e., subject to additional classification 9903.45.25) was unlawful because the president lacked authority to direct CBP to collect safeguard duties on bifacial solar panels after such panels had been excluded from the solar safeguard action.  Because ordinary consumption entries classifiable under 8541.40.6015, HTSUS, are subject to a 0% *ad valorem* duty rate, Plaintiff's protested entries of bifacial solar panels should have been liquidated at a normal *ad valorem* duty rate of 0%.

## COUNT TWO

54.    Paragraphs one through fifty-three of this Complaint are hereby incorporated by reference.

55.    In addition to rescinding the exclusion for bifacial solar modules, Proclamation 10101 also increased the applicable safeguard duty rate on non-bifacial CSPV modules entered during the period from February 7, 2021 through February 6, 2022, from 15 percent to 18 percent.  Proclamation 10101, 85 Fed. Reg. at 65,642.

56.    The CIT set aside the president's increase in safeguard duties from 15 percent to 18 percent on CSPV modules entered between February 7, 2021 and February 6, 2022 as "an action outside the President's legal authority," enjoined United States Customs and Border Protection ("CBP") from enforcing Proclamation 10101, and ordered that safeguard duties collected to Proclamation 10101 be refunded with interest.  SEIA, 45 CIT at __, 553 F.Supp.3d at 134344.

57.     In the alternative, even if the other protested entries were lawfully subject to additional safeguard duties entries, entry nos. FS220060800 and FS220059752, which also contain bifacial CSPV panels, were wrongfully liquidated at an additional safeguard duty rate of 20%.  These entries should not have been liquidated at 20% (i.e., the rate applicable for CSPV entries subject to additional classification 9903.45.25 entered between February 7, 2020 and February 6, 2021) because these two entries were entered between February 7, 2021 and February 6, 2022.

58.     Specifically, Entry No. FS220060800 was entered on February 9, 2021 and Entry No. FS220059752 was entered on February 15, 2021.  Even if entry nos. FS220060800 and FS220059752 were correctly liquidated as subject to additional classification 9903.45.25—and therefore subject to additional safeguard duties—the two entries should not have been liquidated at an *ad valorem* duty rate of 20% (i.e., the additional safeguard duty rate in effect during the period February 7, 2020 and February 6, 2021).  Rather, based upon the dates of entry, entries FS220060800 and FS220059752 should have been liquidated at the *ad valorem* duty rate that was valid and in effect for entries entered during the period between February 7, 2021 and February 6, 2022.

59.     Because the Court set aside the increase in safeguard duties from 15 percent to 18 percent on CSPV modules entered between February 7, 2021 and February 6, 2022 put into effect by Proclamation 10101, any entries that are lawfully subject to additional subheading 9903.45.25, HTSUS, entered during the period February 7, 2020 through February 6, 2021, are subject to an additional safeguard duty of 15% (i.e., the original safeguard duty set forth for entries subject to Proclamation 9693), not 18%.  Accordingly, even if entries FS220060800 and FS220059752 were correctly liquidated as subject to additional classification 9903.45.25—

which they are not for the reasons stated in Count 1—they should have been liquidated at a total *ad valorem* duty rate of 15%.

**COUNT THREE**

60.     Paragraphs one through fifty-nine of this Complaint are hereby incorporated by reference.

61.     In the alternative, even if the other protested entries were lawfully subject to additional safeguard duties entries—and the increase in the additional safeguard duty rate of 18% applicable to entries entered between February 7, 2021 and February 6, 2022 implemented pursuant to Proclamation 10101 were lawful—entry nos. FS220060800 and FS220059752 were wrongfully liquidated at an additional safeguard duty rate of 20%.  These entries should not have been liquidated at 20% (i.e., the rate applicable for CSPV entries subject to additional classification 9903.45.25 entered between February 7, 2020 and February 6, 2021) because these two entries were entered between February 7, 2021 and February 6, 2022.

62.     Specifically, Entry No. FS220060800 was entered on February 9, 2021 and Entry No. FS220059752 was entered on February 15, 2021.  Even if entry nos. FS220060800 and FS220059752 were correctly liquidated as subject to additional classification 9903.45.25—and therefore lawfully subject to the increased 18% additional safeguard duties implemented pursuant to Proclamation 10101—these two entries should not have been liquidated at an *ad valorem* duty rate of 20% (i.e., the additional safeguard duty rate in effect in effect during the period February 7, 2020 and February 6, 2021).  Rather, based upon the dates of entry, entries FS220060800 and FS220059752 should have been liquidated at the *ad valorem* duty rate that was valid and in effect for entries entered during the period between February 7, 2021 and February 6, 2022.  According to Chapter 99, Note 18(h), HTSUS, any entries that are subject to

additional subheading 9903.45.25, HTSUS, entered during the period February 7, 2020 through February 6, 2021, are subject to an additional safeguard duty of 18%.  Accordingly, even if increase in additional safeguard duties implemented pursuant to Proclamation 10101 were lawful and entries FS220060800 and FS220059752 were correctly liquidated as subject to additional classification 9903.45.25—which they are not for the reasons stated in Count 1—they should have been liquidated at a total *ad valorem* duty rate of 18%.

## DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully request that the Court:

(a)     Enter judgment in Plaintiffs' favor;

(b)     Order that Defendants promptly refund, with interest, all increased safeguard duties collected from TUS subject to this appeal, including:  (1) safeguard duties on entries of bifacial modules effective October 25, 2020 through November 16, 2021; and (2) increased safeguard duties (i.e., 18 percent *ad valorem* instead of 15 percent *ad valorem*) on entries of effective February 7, 2021 through November 16, 2021;

(c)     Order that any entries affected by this litigation that may have been liquidated with the assessment of additional safeguard duties, as provided for in Proclamation 10101, be reliquidated without regard to any such duties and with the refund, with interest, of any such duties that were paid and collected; and

(d)      provide such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Jonathan M. Freed
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC  20002
Tel:  (202) 223-3760
jfreed@tradepacificlaw.com

December 7, 2022                          Counsel for Plaintiff Trina Solar (U.S.), Inc

**Trina Solar (U.S)., Inc. v. United States, et al.**
United States Court of International Trade
Court No. 22-00321

**List of Attachments**

| Attachment No. | Description |
|---|---|
| 1 | Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products), 85 Fed. Reg. 65,639 (Oct. 16, 2021) |
| 2 | Exclusion of Particular Products from the Solar Products Safeguard Measure, 84 Fed. Reg. 27,684 (USTR Jun. 13, 2019) |
| 3 | Solar Energy Industries Ass'n et al. v. United States, 45 CIT __, 553 F.Supp.3d 1322 (2021) |
| 4 | Judgment, ECF No. 44, Nov. 16, 2021, entered in Solar Energy Industries Ass'n et al. v. United States, Court No. 20-03941 |
| 5 | Order, ECF No. 47, Dec.7, 2021 entered in Solar Energy Industries Ass'n et al. v. United States, Court No. 20-03941 |
| 6 | U.S. Note 18 to Chapter 99, HTSUS Revision 2 (2022) |
| 7 | CSMS Message # 50263965, "Guidance: Section 201 Bifacial Solar Panels Court Order on Presidential Proclamation 10101" (Dec. 2, 2021) |
| 8 | Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes, 83 Fed. Reg. 3,541 (Jan. 23, 2018) |

# ATTACHMENT 1

Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products), 85 Fed. Reg. 65,639 (Oct. 16, 2021)

# Presidential Documents

Proclamation 10101 of October 10, 2020

## To Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)

**By the President of the United States of America**

**A Proclamation**

1. On January 23, 2018, pursuant to section 203 of the Trade Act of 1974, as amended (the ''Trade Act'') (19 U.S.C. 2253), I issued Proclamation 9693, which imposed a safeguard measure for a period of 4 years that included both a tariff-rate quota (TRQ) on imports of certain crystalline silicon photovoltaic (CSPV) cells, not partially or fully assembled into other products, provided for in subheading 8541.40.6025 of the Harmonized Tariff Schedule of the United States (HTS) and an increase in duties (safeguard tariff) on imports of CSPV cells exceeding the TRQ and imports of other CSPV products, including modules provided for in subheading 8541.40.6015 of the HTS. I exempted imports from certain designated beneficiary countries under the Generalized System of Preferences from the application of the safeguard measure.

2. On February 7, 2020, the United States International Trade Commission (ITC) issued its report pursuant to section 204(a)(2) of the Trade Act (19 U.S.C. 2254(a)(2)), on the results of its monitoring of developments with respect to the domestic solar industry (ITC, Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry, No. TA–201–075 (Monitoring)). In its report, the ITC found that, following imposition of the safeguard measure, prices for CSPV cells and modules declined in a manner consistent with historical trends but were higher than they would have been without the safeguard measure.

3. With respect to CSPV cells, the ITC found that imports increased following imposition of the safeguard measure and that major domestic CSPV cell producers ceased production, leading to declines in domestic CSPV cell production capacity and production.

4. With respect to CSPV modules, imports initially declined but rose in the first half of 2019 compared with the first half of 2018. Additionally, the ITC found that multiple CSPV module producers opened production facilities in the United States, particularly in the first half of 2019, leading to increases in domestic CSPV module production capacity, production, and market share.

5. On March 6, 2020, the ITC issued an additional report pursuant to a request from the United States Trade Representative under section 204(a)(4) of the Trade Act (19 U.S.C. 2254(a)(4)), regarding the probable economic effect on the domestic CSPV cell and module manufacturing industry of modifying the safeguard measure to increase the level of the TRQ on CSPV cells from the current 2.5 gigawatts (GW) to 4.0, 5.0, or 6.0 GW (ITC, Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure, No. TA–201–075 (Modification)). In its report, the ITC advised that increasing the TRQ would

help to continue growth in solar module production but that expanded access to imported cells not subject to safeguard duties would put downward pressure on prices for United States cells.

6. The ITC also found that the exclusion of bifacial modules from the safeguard measure will likely result in substantial increases in imports of bifacial modules if such exclusion remains in effect, and that such modules will likely compete with domestically produced CSPV products in the United States market. Furthermore, the ITC found that the benefits to domestic CSPV module producers from an increase in the TRQ would likely be limited if the bifacial module exclusion remained in place. According to the ITC, bifacial modules are likely to account for a greater share of the market in the future and can substitute for monofacial products in the various market segments, such that exempting imports of bifacial modules from the safeguard tariff would apply significant downward pressure on prices of domestically produced CSPV modules.

7. Section 204(b)(1)(B) of the Trade Act (19 U.S.C. 2254(b)(1)(B)) authorizes the President, upon petition from a majority of the representatives of the domestic industry, to reduce, modify, or terminate an action taken under section 203 of the Trade Act when the President determines that the domestic industry has made a positive adjustment to import competition.

8. Section 204(c)(1) of the Trade Act (19 U.S.C. 2254(c)(1)) authorizes the President to request that the ITC investigate whether action under section 203 of the Trade Act continues to be necessary to prevent or remedy serious injury and whether there is evidence that the domestic industry is making a positive adjustment to import competition. Section 204(c)(3) of the Trade Act (19 U.S.C. 2254(c)(3)) establishes the date by which the ITC will transmit the report on its investigation, unless the President specifies a different date.

9. After taking into account the information provided in the ITC's reports, and after receiving a petition from a majority of the representatives of the domestic industry with respect to each of the following modifications, I have determined that the domestic industry has begun to make positive adjustment to import competition, shown by the increases in domestic module production capacity, production, and market share. In addition, I have made the following further determinations:

(a) that the exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in Proclamation 9693 in light of the increased imports of competing products such exclusion entails, and that it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels;

(b) that the exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-year action I proclaimed in Proclamation 9693, and that to achieve the full remedial effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent.

10. Section 604 of the Trade Act (19 U.S.C. 2483) authorizes the President to embody in the HTS the substance of the relevant provisions of that Act, and of other acts affecting import treatment, and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, acting under the authority vested in me by the Constitution and the laws of the United States, including but not limited to sections 203, 204, and 604 of the Trade Act, do proclaim that:

(1) In order to modify the action applicable to imports of CSPV cells under HTS subheading 8541.40.6025 and other CSPV products such as modules under HTS subheading 8541.40.6015, subchapter III of chapter 99 of the HTS is modified as set forth in the Annex to this proclamation.

(2) The United States Trade Representative is authorized to exercise my authority under section 204(c)(1) and (3) of the Trade Act to request that the ITC investigate whether action under section 203 of the Trade Act continues to be necessary to prevent or remedy serious injury and whether there is evidence that the domestic industry is making a positive adjustment to import competition, and to specify a different date for the ITC to transmit its report.

(3) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

(4) The modifications to the HTS made by this proclamation, including the Annex hereto, shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time 15 days after the date of this proclamation, and shall continue in effect as provided in the Annex to this proclamation, unless such actions are earlier expressly reduced, modified, or terminated. One year from the termination of the safeguard measure established in this proclamation, the U.S. note and tariff provisions established in the Annex to this proclamation shall be deleted from the HTS.

IN WITNESS WHEREOF, I have hereunto set my hand this tenth day of October, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fifth.

Billing code 3295–F1–P

## ANNEX

## TO MODIFY CERTAIN PROVISIONS OF CHAPTER 99 OF THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on October 25, 2020, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States is modified as provided herein:

1. U.S. note 18 to such subchapter III is modified by deleting the following from subdivision (c)(iii) "(15) bifacial solar panels that absorb light and generate electricity on each side of the panel and that consist of only bifacial solar cells that absorb light and generate electricity on each side of the cells;" and by redesignating current subdivisions (c)(iii)(16) and (c)(iii)(17) as subdivisions (c)(iii)(15) and (c)(iii)(16), respectively.

2. U.S. note 18 to subchapter III is further modified by revising subdivisions (f) and (h) to read as follows:

"(f)   For purposes of subheading 9903.45.22 to this subchapter, the duty rate in the Rates of Duty 1-General subcolumn and the Rates of Duty 2 column for all goods entered under such subheading, and not the product of a country enumerated in subdivision (b) of this note, shall be as follows, with the duty rates set forth herein applied in addition to those applicable under subheading 8541.40.60:

If entered during the period from
February 7, 2018 through February 6, 2019.....................................................30%
If entered during the period from
February 7, 2019 through February 6, 2020.....................................................25%
If entered during the period from
February 7, 2020 through February 6, 2021 ...................................................20%
If entered during the period from
February 7, 2021 through February 6, 2022 ...................................................18%"

"(h)   For purposes of subheading 9903.45.25 to this subchapter, the duty rate in the Rates of Duty 1-General subcolumn and the Rates of Duty 2 column in any of the periods enumerated below shall be as follows, with the duty rates set forth herein applied in addition to those applicable under subheading 8541.40.60:

If entered during the period from
February 7, 2018 through February 6, 2019.....................................................30%
If entered during the period from
February 7, 2019 through February 6, 2020.....................................................25%
If entered during the period from
February 7, 2020 through February 6, 2021 ...................................................20%
If entered during the period from
February 7, 2021 through February 6, 2022 ...................................................18%"

[FR Doc. 2020–23108

Filed 10–15–20; 8:45 am]

Billing code 7020–02–C

# ATTACHMENT 2

<u>Exclusion of Particular Products from the Solar Products Safeguard Measure</u>, 84
Fed. Reg. 27,684 (USTR Jun. 13, 2019)

## SUSQUEHANNA RIVER BASIN COMMISSION

### Projects Approved for Consumptive Uses of Water

**AGENCY:** Susquehanna River Basin Commission.

**ACTION:** Notice.

**SUMMARY:** This notice lists the projects approved by rule by the Susquehanna River Basin Commission during the period set forth in **DATES**.

**DATES:** April 1–30, 2019.

**ADDRESSES:** Susquehanna River Basin Commission, 4423 North Front Street, Harrisburg, PA 17110–1788.

**FOR FURTHER INFORMATION CONTACT:** Jason E. Oyler, General Counsel and Secretary to the Commission, telephone: (717) 238–0423, ext. 1312; fax: (717) 238–2436; email: *joyler@srbc.net*. Regular mail inquiries may be sent to the above address.

**SUPPLEMENTARY INFORMATION:** This notice lists the projects, described below, receiving approval for the consumptive use of water pursuant to the Commission's approval by rule process set forth in 18 CFR 806.22(e) and § 806.22(f) for the time period specified above:

### Approvals by Rule Issued Under 18 CFR 806.22(f)

1. SWN Production Company, LLC.; Pad ID: Webster—1; ABR–20090401.R2; Franklin Township, Susquehanna County, Pa.; Consumptive Use of Up to 2.9999 mgd; Approval Date: April 11, 2019.

2. SWN Production Company, LLC.; Pad ID: Holbrook #1; ABR–20090402.R2; Liberty Township, Susquehanna County, Pa.; Consumptive Use of Up to 3.9990 mgd; Approval Date: April 11, 2019.

3. SWN Production Company, LLC.; Pad ID: Turner—1; ABR–20090403.R2; Middletown Township, Susquehanna County, Pa.; Consumptive Use of Up to 3.9990 mgd; Approval Date: April 11, 2019.

4. SWN Production Company, LLC.; Pad ID: Fiondi—1; ABR–20090404.R2; Bridgewater Township, Susquehanna County, Pa.; Consumptive Use of Up to 3.0010 mgd; Approval Date: April 11, 2019.

**Authority:** Pub. L. 91–575, 84 Stat. 1509 *et seq.*, 18 CFR parts 806 and 808.

Dated: June 10, 2019.

**Jason E. Oyler,**
*General Counsel and Secretary to the Commission.*

[FR Doc. 2019–12509 Filed 6–12–19; 8:45 am]

**BILLING CODE 7040–01–P**

## OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

[Docket No. USTR–2018–0001]

### Exclusion of Particular Products From the Solar Products Safeguard Measure

**AGENCY:** Office of the United States Trade Representative.

**ACTION:** Notice of product exclusions.

**SUMMARY:** On January 23, 2018, the President imposed a safeguard measure on imports of certain solar products pursuant to a Section 201 investigation. On February 14, 2018, the United States Trade Representative (Trade Representative) established a procedure to request product-specific exclusions from application of the safeguard measure. On September 19, 2018, the Trade Representative granted certain of those exclusion requests. This notice announces the Trade Representative's determination to grant additional exclusion requests, as specified in the Annex to this notice. The Trade Representative will not further consider exclusion requests that were not granted in this or the September 19 notices. This action is without prejudice to the Trade Representative's authority to grant exclusions if there is another round of requests for exclusion.

**DATES:** The product exclusions announced in this notice will apply as of June 13, 2019.

**FOR FURTHER INFORMATION CONTACT:** Victor Mroczka, Office of WTO and Multilateral Affairs, at *vmroczka@ustr.eop.gov* or (202) 395–9450, or Dax Terrill, Office of General Counsel, at *Dax.Terrill@ustr.eop.gov* or (202) 395–4739.

**SUPPLEMENTARY INFORMATION:**

### A. Background

On January 23, 2018, the President, issued Proclamation 9693 (83 FR 3541) to impose a safeguard measure with respect to certain crystalline silicon photovoltaic (CSPV) cells and other products (CSPV products) containing these cells. The Proclamation directed the Trade Representative to establish procedures for interested persons to request the exclusion of particular products from the safeguard measure. It also authorized the Trade Representative, in consultation with the Secretaries of Commerce and Energy, to exclude particular products and modify the Harmonized Tariff Schedule of the United States (HTSUS) upon publication of a determination in the **Federal Register**.

On February 14, 2018, the Trade Representative issued a notice setting

out the procedure to request product exclusions, and opened a public docket. *See* 83 FR 6670 (the February 14 notice). Under the February 14 notice, requests for exclusion were to identify the particular product in terms of its physical characteristics, such as dimensions, wattage, material composition, or other distinguishing characteristics, that differentiate it from other products that are subject to the safeguard measure. The notice provided that the Trade Representative would not consider requests identifying the product at issue in terms of the identity of the producer, importer, or ultimate consumer; the country of origin; or trademarks or tradenames. It also noted that the Trade Representative would only grant exclusions that did not undermine the objectives of the safeguard measure.

The February 14 notice provided for consideration of submissions requesting an exclusion that were filed no later than March 16, 2018. The Office of the U.S. Trade Representative (USTR) received 48 product exclusion requests and 213 subsequent comments responding to various requests. The exclusion requests generally fell into seven categories: (1) Products that consist of attachments or other parts that can be mounted to solar products; (2) products that constitute 72-cell or greater panels; (3) products with particular configurations for additional performance; (4) products with specialized functions; (5) consumer and specialty products; (6) bifacial panels and bifacial solar cells; and (7) solar cells without busbars or gridlines and panels containing these solar cells.

On September 19, 2018, the Trade Representative granted certain product exclusion requests with a determination in the **Federal Register** (83 FR 47393).

### B. Determination To Grant Certain Exclusions

Based on an evaluation of the factors set out in the February 14 notice, which are summarized above, the Trade Representative has determined to grant the product exclusions set out in the Annex to this notice.

### C. Remaining Requests Not Addressed in This Notice

USTR has completed review of all exclusion requests received in response to the February 14 notice. The Trade Representative will not further consider exclusion requests that were not granted in this or the September 19 notices. This action is without prejudice to the Trade Representative's authority to grant exclusions if USTR initiates another round of requests for exclusion.

## D. Future Exclusion Requests

The Trade Representative is not entertaining additional exclusion requests at this time. However, USTR will monitor developments in the U.S. market for CSPV products and, if warranted, provide an opportunity to submit additional requests for exclusion at a future date.

**Annex**

Effective with respect to articles entered, or withdrawn from a warehouse for consumption, on or after 12:01 a.m. eastern daylight time on June 13, 2019, U.S. note 18 to subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified by inserting the following new subdivisions in numerical sequence at the end of subdivision (c)(iii):

"(15) bifacial solar panels that absorb light and generate electricity on each side of the panel and that consist of only bifacial solar cells that absorb light and generate electricity on each side of the cells;

(16) flexible fiberglass solar panels without glass components other than fiberglass, such panels having power outputs ranging from 250 to 900 watts;

(17) solar panels consisting of solar cells arranged in rows that are laminated in the panel and that are separated by more than 10 mm, with an optical film spanning the gaps between all rows that is designed to direct sunlight onto the solar cells, and not including panels that lack said optical film or only have a white or other backing layer that absorbs or scatters sunlight.''

**Jeffrey Gerrish,**
*Deputy United States Trade Representative, Office of the U.S. Trade Representative.*
[FR Doc. 2019–12476 Filed 6–12–19; 8:45 am]
**BILLING CODE 3290–F9–P**

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

[Summary Notice No. 2018–80]

### Petition for Exemption; Summary of Petition Received; American Aerospace Technologies, Inc.

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Notice.

**SUMMARY:** This notice contains a summary of a petition seeking relief from specified requirements of Federal Aviation Regulations. The purpose of

this notice is to improve the public's awareness of, and participation in, the FAA's exemption process. Neither publication of this notice nor the inclusion or omission of information in the summary is intended to affect the legal status of the petition or its final disposition.

**DATES:** Comments on this petition must identify the petition docket number and must be received on or before July 3, 2019.

**ADDRESSES:** Send comments identified by docket number FAA–2018–0864 using any of the following methods:

• *Federal eRulemaking Portal:* Go to *http://www.regulations.gov* and follow the online instructions for sending your comments electronically.

• *Mail:* Send comments to Docket Operations, M–30; U.S. Department of Transportation, 1200 New Jersey Avenue SE, Room W12–140, West Building Ground Floor, Washington, DC 20590–0001.

• *Hand Delivery or Courier:* Take comments to Docket Operations in Room W12–140 of the West Building Ground Floor at 1200 New Jersey Avenue SE, Washington, DC 20590–0001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

• *Fax:* Fax comments to Docket Operations at (202) 493–2251.

*Privacy:* In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its rulemaking process. DOT posts these comments, without edit, including any personal information the commenter provides, to *http://www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *http://www.dot.gov/privacy.*

*Docket:* Background documents or comments received may be read at *http://www.regulations.gov* at any time. Follow the online instructions for accessing the docket or go to the Docket Operations in Room W12–140 of the West Building Ground Floor at 1200 New Jersey Avenue SE, Washington, DC 20590–0001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Jake Troutman, (202) 683–7788, Office of Rulemaking, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591.

This notice is published pursuant to 14 CFR 11.85.

Issued in Washington, DC, on June 7, 2019.
**James M. Crotty,**
*Acting Executive Director, Office of Rulemaking.*

**Petition For Exemption**

*Docket No.:* FAA–2018–0864.
*Petitioner:* American Aerospace Technologies, Inc.
*Section(s) of 14 CFR Affected:* §§ 61.113(a) & (b); 61.133(a); 91.7(a); 91.9(b)(2); 91.103(b)(1); 91.119(c); 91.121; 91.151; 91.203(a) & (b); 91.405(a); 91.407(a)(1); 91.409(a)(2); 91.417(a) & (b).

*Description of Relief Sought:* The proposed exemption, if granted, would allow the commercial operation of the HX8 XXL octocopter unmanned aircraft system, manufactured by Harris Aerial, weighing not more than 150 pounds for the purpose of conducting critical infrastructure operations during routine operations and in emergency support operations in conjunction with emergency first responders. Routine operations include asset inspection and mapping, construction support, and custom sensor deployment. Emergency operations include locating and sensing outages and disaster recovery support. The pilot in command will hold, at minimum, a part 107 Operator's Certificate, a Private Pilot Knowledge Test Certificate, a Third-Class Medical Certificate, and will have completed the Private Pilot Ground School.

[FR Doc. 2019–12444 Filed 6–12–19; 8:45 am]
**BILLING CODE 4910–13–P**

## DEPARTMENT OF TRANSPORTATION

### Federal Motor Carrier Safety Administration

[Docket No. FMCSA–2019–0006]

### Qualification of Drivers; Exemption Applications; Vision

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), DOT.

**ACTION:** Notice of final disposition.

**SUMMARY:** FMCSA announces its decision to exempt nine individuals from the vision requirement in the Federal Motor Carrier Safety Regulations (FMCSRs) to operate a commercial motor vehicle (CMV) in interstate commerce. They are unable to meet the vision requirement in one eye for various reasons. The exemptions enable these individuals to operate CMVs in interstate commerce without meeting the vision requirement in one eye.

# ATTACHMENT 3

<u>Solar Energy Industries Ass'n et al. v. United States</u>, 45 CIT __, 553 F.Supp.3d 1322 (2021)

553 F.Supp.3d 1322
United States Court of International Trade.

SOLAR ENERGY INDUSTRIES
ASSOCIATION, NextEra Energy,
Inc., Invenergy Renewables LLC,
and EDF Renewables, Inc., Plaintiffs,
v.
UNITED STATES, United States Customs
and Border Protection, and Troy A.
Miller, in His Official Capacity as Acting
Commissioner of United States Customs
and Border Protection, Defendants.

Slip Op. 21-154
|
Court No. 20-03941
|
November 16, 2021

**Synopsis**
**Background:** National trade association for solar industry
and renewable energy companies brought action against
government, challenging Presidential Proclamation that
withdrew exclusion of bifacial solar panels from safeguard
duties on imported solar panels, and seeking declaratory and
injunctive relief. Government moved to dismiss and plaintiffs
moved for summary judgment.

**Holdings:** The Court of International Trade, Gary S.
Katzmann, J., held that:

three letters submitted by domestic industry representatives
constituted a "petition" within meaning of Trade Act section
authorizing the President to adjust safeguard measures if
certain conditions were met;

submission of petition to United States Trade Representative
(USTR), rather than to the President, was not procedural
violation of safeguard-adjustment statute;

petition constituted request from majority of representatives
of domestic solar industry, as required by safeguard-
adjustment statute;

President's determination that domestic industry "has begun
to make" a positive adjustment to import competition, rather
than "has made" such positive adjustment, did not constitute
procedural violation of safeguard-adjustment statute;

Presidential Proclamation did not violate Trade Act's
prohibition on new safeguard measures on an article for
at least two years from date on which previous measures
terminated;

Presidential Proclamation did not violate the statutory
requirement to weigh economic and social costs and benefits
of a safeguard measure before imposing it; but

Presidential Proclamation constituted action outside the
President's delegated authority under the safeguard-
adjustment statute.

Summary judgment motion granted; motion to dismiss
denied.

**Attorneys and Law Firms**

*1325 Matthew R. Nicely and Daniel M. Witkowski, Akin,
Gump, Strauss, Hauer & Feld LLP, of Washington, D.C.,
argued for Plaintiffs Solar Energy Industries Association and
NextEra Energy, Inc. With them on the briefs were James E.
Tysse, Devin S. Sikes and Julia K. Eppard.

Amanda Shafer Berman, and John Brew, Crowell & Moring
LLP, of Washington, D.C. and New York, N.Y., argued for
Plaintiff Invenergy Renewables LLC. With them on the briefs
were Larry F. Eisenstat and Frances Hadfield.

Christine M. Streatfeild and Kevin M. O'Brien, Baker &
McKenzie LLP, of Washington, D.C., argued for Plaintiff
EDF Renewables, Inc.

Stephen C. Tosini, Senior Trial Counsel, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice,
of Washington, D.C., argued for Defendants United States,
United States Customs and Border Protection, and Troy A.
Miller, in his Official Capacity as Acting Commissioner of
United States Customs and Border Protection. With him on
the briefs were Brian M. Boynton, Acting Assistant Attorney
General, Jeanne E. Davidson, Director, and Tara K. Hogan,
Assistant Director, and Joshua E. Kurland, Trial Attorney.

## OPINION

Katzmann, Judge:

**\*1326**  Solar modules consist of cells that convert sunlight into electricity on both the front and the back of the cells.[1] The court has on five occasions addressed ongoing litigation involving efforts by the President to withdraw an exclusion from safeguard duties on imported solar modules, duties which the President had imposed by proclamation to protect the domestic industry from serious injury suffered due to increased imports.[2] Flowing from a new complaint, the case now before the court principally involves the most recent effort by the President in 2020, invoking Section 204 of the Trade Act of 1974 ("Trade Act") -- a separate track not adjudicated in the previous litigation -- to withdraw an exclusion from safeguard duties on imported solar modules. That section provides that if certain conditions are met, the President is authorized to "reduce, modify, or terminate" previously instituted safeguard measures. Plaintiffs Solar Energy Industries Association ("SEIA"), NextEra Energy, Inc. ("NextEra"), Invenergy Renewables LLC ("Invenergy"), and EDF Renewables, Inc. ("EDF-R")[3] have initiated this suit to challenge Presidential Proclamation 10101, which withdrew the exclusion of bifacial solar panels from Section 201 safeguards on imported crystalline silicon photovoltaic ("CSPV") solar panels. Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products), 85 Fed. Reg. 65,639 (Oct. 16, 2020) ("Proclamation 10101"); Complaint at 1, Dec. 29, 2020, ECF No. 2 ("Compl.").

**\*1327**  Named as Defendants are the United States, United States Customs and Border Protection ("CPB"), and Troy A. Miller, in his Official Capacity as Acting CBP Commissioner (collectively "the Government.")

This case raises a number of questions regarding the interface of Proclamation 10101 with Sections 201–204 of the Trade Act. For example: (1) Do three letters (reflecting a majority of the domestic industry production) which seek the modification of safeguards constitute a petition as required by statute? (2) Is the requirement that a petition be submitted to the President satisfied by submission to the United States Trade Representative ("USTR")? (3) Does the Proclamation's withdrawal of the exclusion for bifacial modules violate the statutory temporal restrictions which must be met before

new presidential action may be taken? (4) Was Proclamation 10101 issued in violation of the requirement that the President determine that an action will "provide greater economic and social benefits than costs"? (5) Can the word "modify" in Section 204(b)(1)(B) be read to permit increased restrictions on trade? The court concludes that with respect to the first four questions, the answer is "Yes." With respect to the fifth question, the answer is "No."

Plaintiffs allege that Proclamation 10101 violates Sections 201, 203 and 204 of the Trade Act and seek both a declaratory judgment that the proclamation is unlawful and the injunction of its enforcement. Compl. at 16–21. The Government has moved to dismiss Plaintiffs' complaint; Plaintiffs oppose this motion and have moved separately for summary judgment. The Government in turn opposes Plaintiffs' motion. The court concludes that the various procedural challenges posed by Plaintiffs to Proclamation 10101 are unpersuasive. However, the court also concludes that because Section 204(b)(1)(B) permits only trade-liberalizing modifications to existing safeguard measures, Proclamation 10101's withdrawal of the exclusion of bifacial solar panels and increase of the safeguard duties on CSPV modules constituted both a clear misconstruction of the statute and action outside the President's delegated authority. The court now grants Plaintiffs' motion for summary judgment and denies the Government's motion to dismiss.

## BACKGROUND

### I. Legal & Regulatory Framework

Section 201 of the Trade Act of 1974 authorizes the executive branch to implement discretionary protective measures ("safeguards") to protect a domestic industry from the harm associated with an increase in imports from foreign competitors, and Sections 202 through 204 lay out the procedures for issuing such safeguards. 19 U.S.C. §§ 2251–54. Relevant here, Section 202 provides that upon petition from domestic entities or industries, the International Trade Commission ("ITC") may make an affirmative determination that imports have seriously injured, or threaten serious injury to, domestic industry. 19 U.S.C. § 2252. Once such a determination has been made, Section 203 permits the President to authorize safeguard measures to temporarily protect domestic industry from the identified harm. 19 U.S.C. § 2253.

For the duration of any safeguard measure, Section 204 provides that the ITC shall monitor "developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition." 19 U.S.C § 2254(a)(1). If a safeguard duty is imposed for longer than three years, the ITC "shall submit a report on the results of the monitoring ... **\*1328** to the President and to the Congress not later than the date that is the mid-point of the initial period, and of each such extension, during which the action is in effect." 19 U.S.C § 2254(a)(2).

Upon receipt of this report, the President is authorized to reduce, modify, or terminate the safeguard measures according to either 19 U.S.C. § 2254(b)(1)(A) or 19 U.S.C. § 2254(b)(1)(B). The statute specifically provides that:

(1) Action taken under [Section 203] may be reduced, modified, or terminated by the President (but not before the President receives the report required under subsection (a)(2)(A)) if the President—

(A) after taking into account any report or advice submitted by the Commission under subsection (a) and after seeking the advice of the Secretary of Commerce and the Secretary of Labor, determines, on the basis that either—

(i) the domestic industry has not made adequate efforts to make a positive adjustment to import competition, or

(ii) the effectiveness of the action taken under [Section 203] of this title has been impaired by changed economic circumstances, that changed circumstances warrant such reduction, or termination;

(B) determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b)(1).

Safeguard measures have a maximum duration of four years, unless extended for another maximum of four years based upon a new determination by the ITC. 19 U.S.C. § 2253(e)(1). In addition, measures resulting in the increase or imposition of duties on an article, the institution of a tariff-rate quota with respect to an article, the imposition or modification of qualitative import restrictions on an article, or

limitations on the import of an article subject to international agreements face a two-year "cooling-off period," during which further action is restricted. 19 U.S.C. § 2253(e)(7)(A). Once terminated, such safeguard measures may not be re-imposed, nor may additional such measures be enacted on the same article, for at least two years following the date of termination. Id.

### II. Factual Background & Procedural History

On January 23, 2018, President Trump issued Presidential Proclamation 9693, which imposed a safeguard measure under Section 203(a)(3) of the Trade Act on certain CSPV products. Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes, 83 Fed. Reg. 3,541 (Jan. 23, 2018) ("Proclamation 9693"). Proclamation 9693 imposed a duty on CSPV modules for a four-year period beginning on February 7, 2018. Id.

On February 14, 2018, USTR published a notice detailing the procedures to request a product exclusion. Procedures to Consider Additional Requests for Exclusion of Particular Products from the Solar Products Safeguard Measure, 83 Fed. Reg. 6,670 (USTR Feb. 14, 2018). Pursuant to these procedures, on June 13, 2019, USTR granted a number of requested exclusions from the safeguard measures declared by **\*1329** Proclamation 9693, including an exclusion for bifacial solar panels. Exclusion of Particular Products from the Solar Products Safeguard Measure, 84 Fed. Reg. 27,684 (USTR Jun. 13, 2019).

USTR attempted to withdraw the exclusion of bifacial solar panels on October 9, 2019 and again on April 17, 2020. Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure, 84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) ("First Withdrawal"); Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) ("Second Withdrawal"). Each withdrawal was issued on the basis that "[s]ince publication of [the exclusion] notice, the U.S. Trade Representative has evaluated this exclusion further and ... determined it will undermine the objectives of the safeguard measure," First Withdrawal, 84 Fed. Reg. at 54,244; with the Second Withdrawal noting that bifacial solar panel imports are directly substitutable for domestically-produced monofacial solar panels, and concluding that because "[c]ompetition

from low-priced imports prevented domestic producers from selling significant quantities of solar panels in the utility segment during the ITC's original investigation period ... low-priced imports of bifacial solar panels due to the exclusion are likely to have a similar effect under current market conditions," 85 Fed. Reg. at 21,498.

Both attempted withdrawals were challenged before the court in Invenergy Renewables LLC v. United States, with consumers, purchasers, and importers of utility-grade bifacial solar panels "argu[ing] that the importation of bifacial solar panels does not harm domestic producers because domestic producers do not produce utility-scale bifacial solar panels; [and] thus oppos[ing] safeguard duties that they contend increase the cost of these bifacial solar panels." Invenergy I, 422 F. Supp. 3d at 1264. Both withdrawals were ultimately enjoined. See id. at 1294; Invenergy IV, 476 F. Supp. 3d at 1356–57. Following the court's expansion of its preliminary injunction to include the Second Withdrawal in Invenergy IV, President Trump issued Proclamation 10101 on October 16, 2020. Proclamation 10101 again withdrew the exclusion, thereby re-imposing safeguard duties on bifacial modules, and further increased the safeguard duties on CSPV modules declared under Proclamation 9693 from 15% to 18%.[4] 85 Fed. Reg. at 65,640–42.

Plaintiffs sought to incorporate Proclamation 10101 into the ongoing Invenergy litigation, and into the court's previously issued PI enjoining USTR from withdrawing the exclusion. See Invenergy V, 482 F. Supp. 3d at 1351. The court denied both leave to amend and expansion of the PI, finding that Plaintiffs' Proclamation 10101 claims "involve actions undertaken by the President, a party not implicated in Plaintiffs' complaints or supplemental complaints [in the Invenergy litigation] and seek relief against the President not contemplated by Plaintiffs' prior pleadings" -- in other words, that "the core issues are different." Id. at 1353. In the wake of the court's denial, this action was filed in a separate complaint on December 29, 2020. Compl.

The Government filed a motion to dismiss the action on March 1, 2021. Defs.' Mot. to Dismiss, March 1, 2021, ECF No. 17 ("Defs.' Br."). Plaintiffs filed a cross-motion **1330 for summary judgment and a response to the Government's motion to dismiss on May 7, 2021. Pls.' Resp. to Defs.' Mot. to Dismiss and Cross-Mot. for Summ. J., ECF No. 28 ("Pls.' Resp."). The Government filed its reply to Plaintiffs' motion for summary judgment on June 11, 2021. Defs.' Reply in Supp. of Mot. to Dismiss and Resp. to Pls.' Mot. for Summ.

J., ECF No. 30 ("Defs.' Reply"). On June 25, 2021, Plaintiffs filed their own reply in support of their cross-motion for summary judgment. Pls.' Reply in Support of Cross-Mot. for Summ. J., ECF No. 32 ("Pls.' Reply"). In response to a request by the court, the parties filed written responses prior to argument. Defs.' Resp. to the Ct.'s Questions, Jul. 9, 2021, ECF No. 35; Pls.' Resp. to Oral Arg. Questions. Oral argument was held July 13, 2021 and the parties filed supplemental briefs on the issues discussed at oral argument thereafter. Oral Arg., ECF No. 38; Defs.' Suppl. Br., Jul. 20, 2021, ECF No. 39; Defs.' Transpacific Br., Jul. 20, 2021, ECF No. 40; Pls.' Transpacific Br., Jul. 20, 2021, ECF No. 41; Pls.' Suppl. Br., Jul. 20, 2021, ECF No. 42.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(i), which provides that the court "shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of the law of the United States providing for ... [the] administration and enforcement" of tariffs and duties. The court may review Presidential action pursuant to Section 201, insofar as it gives rise to a controversy involving international trade and foreign affairs, for a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." See Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985).

## DISCUSSION

Plaintiffs raise four overarching claims. First, Plaintiffs argue that Proclamation 10101 violates the procedural requirements of Section 204(b)(1)(B) of the Trade Act with respect to the nature and contents of the petition the President must receive prior to taking action. Second, Plaintiffs claim that Proclamation 10101 violates the requirements of Section 203(e)(7) of the Trade Act by imposing a new safeguard measure on bifacial modules less than two years after the previous measure -- namely, the duties imposed by Proclamation 9693 -- expired. Third, Plaintiffs argue that Proclamation 10101 violates the requirements of Section 201 of the Trade Act because the President failed to weigh the social and economic costs and benefits of the modifications prior to issuing the proclamation. Finally, Plaintiffs argue that Proclamation 10101 violates the substantive requirements of

Section 204(b)(1)(B) of the Trade Act by increasing safeguard measures under the aegis of that provision.

The court addresses each of these arguments in turn and concludes that while the Government prevails on the questions of procedural compliance -- the form, contents, and timing of the petition, as well as the President's assessment of costs and benefits -- Proclamation 10101 ultimately fails to comply with the substantive requirements of Section 204(b)(1)(B) of the Trade Act. Accordingly, the court grants Plaintiffs' motion for summary judgment and denies the Government's motion to dismiss.

### I. *Proclamation 10101 Does Not Violate the Procedural Requirements of § 204(b)(1)(B) of the Trade Act*

Plaintiffs identify five procedural requirements within Section 204(b)(1)(B). **\*1331** Four of these requirements pertain to features of the petition submitted by the domestic industry: first, "the petition must be submitted by 'a majority of the representatives of the domestic industry' "; second, it must be submitted to the President; third, "by the use of the language '*such* reduction, modification, or termination,' the petition must request the reduction, modification, or termination that the President ultimately adopts" and fourth, "by the use of the language 'on *such* basis,' the petition must request the reduction, modification or termination on the basis that 'the domestic industry has made a positive adjustment to import competition.' " Pls.' Resp. at 13–14 (quoting 19 U.S.C. § 2254(b)(1)(B)). The final requirement Plaintiffs identify is that the President must find that the industry "has made a positive adjustment to import competition." Id.; 19 U.S.C. § 2254(b)(1)(B).

Plaintiffs' arguments that Proclamation 10101 significantly violated the procedural requirements of Section 204 are unpersuasive. The court concludes that: (1) the letters submitted to the Trade Representative are, taken collectively, sufficient to constitute a petition to the President; (2) submission to USTR was sufficient to satisfy the requirements of the statute; (3) the petition adequately complied with the statute's requirement that "such reduction, modification, or termination" be requested by the "majority of the representatives of the domestic industry"; (4) the petition in this case did not significantly violate 204(b)(1)(B)'s "on such basis" requirement; and (5) the President's finding that the domestic industry "has begun to make" a positive adjustment to import competition again does not significantly violate the statutory requirement that the President find the

domestic industry "has made," a positive adjustment to import competition. 19 U.S.C. § 204(b)(1)(B).

As a preliminary matter, the parties dispute the jurisdiction of the court over the above questions. Plaintiffs contend that they are requesting judicial inquiry into whether the President satisfied the statutory predicates for action under the safeguard statute, and that the challenge to Proclamation 10101 is therefore within the authority of the court. Pls.' Resp. at 17–21; see Silfab Solar, Inc. v. United States, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (holding that courts may set aside Presidential action if the President "acts beyond his statutory authority"). The Government, meanwhile, frames the inquiry as a requested review of Presidential fact-finding, which would be outside the scope of judicial review. Defs.' Reply at 10–12; see Florsheim Shoe Co., Div. of Interco, Inc. v. United States, 744 F.2d 787, 796 (Fed. Cir. 1984) ("After it is decided that the President has congressional authority for his action, 'his motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny.' " (quoting United States Cane Sugar Refiners' Ass'n v. Block, 683 F.2d 399, 404 (C.C.P.A. 1982))).

Plaintiffs' view prevails. It has been established by the Federal Circuit that courts may consider whether "the President has violated an explicit statutory mandate." Motions Sys. Corp. v. Bush, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc). Such analysis has been undertaken where the disputed Presidential action constitutes an exercise of delegated authority without complete discretion, including where the President has acted to institute safeguard measures under the Trade Act. See, e.g., Maple Leaf Fish Co., 762 F.2d at 89; see also, e.g., Corus Group PLC v. Int'l Trade Com'n, 352 F.3d 1351, 1358–59 (Fed. Cir. 2003). Here as well, the court may consider whether the President's action constituted a "clear misconstruction of **\*1332** the governing statute, a significant procedural violation, or action outside delegated authority." Silfab, 892 F.3d at 1346 (citing Maple Leaf Fish Co., 762 F.2d at 89).

Even so, the law is clear that claims alleging violation of the President's statutory mandate face an extraordinarily high bar for success. The court in Silfab Solar, Inc. v. United States, for example, determined that even where procedural violations are alleged with respect to the agency recommendations underlying Presidential action, the President may nevertheless act to approve those recommendations without judicial intrusion. Silfab, 892 F.3d at 1347 (rejecting challenge to Presidential action

under Section 201 following alleged procedural violations by the ITC under Section 202). Silfab also made clear that the failure of the President to comply with statutory requirements generally, so long as those requirements are not conditions precedent to the action challenged before the court, provides no basis for overturning the challenged action. Id. Similarly, in Maple Leaf Fish Co. v. United States, the court determined that reliance on an allegedly flawed ITC report nevertheless did not invalidate the resultant Presidential action. These cases illustrate that more is required for a successful challenge to Presidential safeguards than simple noncompliance, and Plaintiffs' challenges must be weighed against that benchmark here.

### A. The Petition

With respect to the petition, Plaintiffs allege that the three letters which constitute the purported petition do not satisfy the requirements of Section 204(b)(1)(B) because (1) they were not a petition to the President within the meaning of the statute; (2) they only contained requests from three companies for a change in the duty rate and from five companies for the withdrawal of the exclusion, and thus were not a petition by a majority of the representatives of the domestic industry for the same modification instituted by the President; and (3) they failed to allege that the domestic industry has made a positive adjustment to import competition, "much less [to] identify such positive adjustment as the basis for their request to modify the safeguard measure." Pls.' Resp. at 16. The Government responds that (1) the statute does not define "petition," and the President therefore "lawfully accepted the domestic industry's communications as 'a petition' under the statute;" (2) the petition constituted a request from the majority of the industry by production volume and collectively requested the relief granted by the President; and (3) the statute does not require petitioners to assert that the industry has made a positive adjustment to import competition. Defs.' Reply at 8, 14–21. The court addresses each of these arguments in turn.

### 1. The Letters Submitted to USTR Constituted a Petition

With respect to the requirement that a petition be submitted to the President, Plaintiffs' overarching argument is that "an amalgamation of three letters submitted to USTR" by Auxin Solar, SolarTech Universal, Mission Solar Energy, LG Electronics USA, Inc., and Hanwha Q CELLS cannot

constitute a petition. Pls.' Resp. at 14. Plaintiffs object to both the form and timing of the alleged petition.

First, Plaintiffs argue that that the earliest of the three letters, submitted to USTR in July 2019, cannot serve as the basis for Presidential action in any case because it was submitted prior to the issuance of the ITC's midterm report. Pls.' Resp. at 15. This argument is without merit, as 19 U.S.C. § 2254(b)(1) requires only that the President must receive the ITC report before taking action and does not require any particular timing with respect to **\*1333** to industry petitions. The court therefore rejects Plaintiffs' timing argument.

Next, Plaintiffs argue that "multiple documents" do not constitute " 'a petition' in the singular," and therefore the three letters comprising the alleged petition fail to satisfy the text of the statute. Pls.' Resp. at 14. However, as the Government notes, the statute provides no requirement for the form a petition must take. Defs.' Reply at 12. Furthermore, the United States Code provides that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise -- words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1; Defs.' Reply at 13. There is no indication in the statute that a petition must constitute a single document. The court therefore determines that the letters submitted in this case were reasonably construed as a petition under the meaning of Section 204(b)(1)(B).

### 2. Submission of the Letters to USTR was Not a Procedural Violation

In addition to disputing that the letters in this case constitute a petition, Plaintiffs argue that any petition in fact submitted fails to satisfy Section 204(b)(1)(B) because it was submitted to USTR and not to the President. Pls.' Resp. at 14. The court rejects this argument for two reasons. First, the statute does not require, or even suggest, that the President may not exercise discretion in determining the appropriate method of submission. By contrast, where Congress has intended strict requirements with respect to petitions under the safeguard statute, those requirements have generally been explicit. For example, Section 202 of the Trade Act requires that a petition under that section be "filed with the Commission" and additional documents "submit[ted] to the Commission and the [USTR]" within a set period, and further prescribes specific language that must be included in the petition. 19 U.S.C. § 2252(a)(1), (3)–(4). No such detailed requirements

are found under Section 204(b)(1)(B). Accordingly, the court declines to read such inflexibility into the statute. See Jama v. Immigration and Customs Enf't, 543 U.S. 335, 341, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Furthermore, the petitions were submitted to USTR, and USTR is the agency which "act[s] as the principal spokesperson of the President on international trade."[5] 19 U.S.C. § 2171(c)(1)(E). With respect to safeguard duties specifically, the statute contemplates the close relationship between the President and USTR; requiring that "the interagency trade organization established under 1872(a)," of which USTR is chair, "make a recommendation to the President as to what action the President should take" prior to the institution of any safeguards. 19 U.S.C. § 2253(a)(1)(C); 19 U.S.C. § 1872(a)(3)(A). Given the close relationship of USTR and the President in the context of trade regulation and of safeguards specifically, the court finds that filing the petitions with USTR reasonably satisfied Section 204(b)(1)(B)'s requirement that the petitions be submitted to the President.

**\*1334  3. The Petition Constituted a Request from the Majority of the Representatives of the Domestic Industry for the Relief Granted by the President**

Plaintiffs next argue that even if the three letters submitted to USTR constitute a valid petition, the withdrawal was requested by at most six out of twenty of the "representatives of the domestic industry," which is less than a majority and therefore in violation of the statute. Pls.' Resp. at 16–17. The Government counters that it is appropriate to look to production volume to determine if a majority of domestic industry representatives have submitted a petition, and that by this measure a majority of the domestic industry has requested both the withdrawal of the exclusion and the increased duty rate imposed by Proclamation 10101. Defs.' Reply at 15–18. Plaintiffs, in turn, respond that this conflates "a majority of the representatives" -- the language of the statute -- with "representatives of the majority." Pls.' Reply at 7. The latter language, according to Plaintiffs, might permit measuring the majority by production volume, but " 'majority of the

representatives' reflects a majority of particular individuals." Id.

The language of the statute belies Plaintiffs' interpretation. Section 202(c)(6)(A)(i) defines "domestic industry" with respect to a specific article as "the producers as a whole of the like or directly competitive article or those producers whose collective production of the like or directly competitive article constitutes a major proportion of the total domestic production of such article." 19 U.S.C. § 2252(c)(6)(A)(i). Clearly, the statute permits definition of domestic industry on the basis of production volume. Id. Section 204(b)(1)(B) may accordingly be read to require (prior to any safeguard adjustments) a petition by "a majority of the representatives of" the producers who are responsible for a "major proportion" of domestic production, and a finding by the President that the same producers have positively adjusted to import competition. 19 U.S.C. § 2254(b)(1)(B). In short, Section 204(b)(1)(B) implicitly contemplates the submission of a petition by those producers responsible for the majority of production volume. Id.

Nor does context support a reading of 204(b)(1)(B) that focuses on a numerical majority of representatives, rather than a proportional majority of manufacturers. First, the statute requires that a "majority ... submits" a petition, not that a majority of the representatives submit a petition. Id. Second, it is clear from the statute's follow-on requirement that the President determine that the domestic industry as a whole has positively adjusted to competition that 204(b)(1)(B) is intended to permit changes to a safeguard measure where a specific domestic industry has overall adapted to competition -- not when a certain number of producers have requested modification. Id. Requiring that a numerical majority of industry representatives petition for modification, regardless of the associated production volume, would therefore not support the ultimate aim of 204(b)(1)(B) as there is no indication that such a numerical majority would reflect industry-wide adaptation. Accordingly, the court concludes that the statute should not be read to exclusively require petition by a majority of representatives.

Having thus determined that production volume is an appropriate metric for the assessment of a petition, the court concludes that a majority of the domestic industry requested the modifications. Auxin, Hanwha Q CELLS, and LG requested the modification of the tariff rate in the fourth year of the solar safeguard measure, and according to the confidential filings submitted to the court, these

representatives **\*1335** constitute a majority of the domestic industry by production volume. See ITC Pub. 5021 at III-14 III-15 (Table III-4). Similarly, Auxin, Hanwha Q CELLS, Heliene, Mission, and Solar Tech requested withdrawal of the bifacial exclusion, and these domestic producers, too, constitute a majority of production during the relevant period. Id. Thus, the court finds no basis to conclude that a majority of the domestic industry representatives failed to request the relief granted by the President.

### 4. *Proclamation 10101 Did Not Clearly Misconstrue the Language of Section 204(b)(1)(B)*

Finally, the parties dispute whether the petition submitted by the domestic industry must request relief on the basis that the domestic industry has made a positive adjustment to import competition. Plaintiffs' argument hinges on the statute's inclusion of "on such basis," which they contend should be read to require that petitioners must request reduction, modification, or termination of the safeguard measure on the basis that the domestic industry has made a positive adjustment to competition. Pls.' Resp. at 14–15. The Government argues that the statute must instead be interpreted to require the President to determine the domestic industry has made a positive adjustment to competition on the basis of either the petition or the ITC midterm review report referenced earlier in Section 204. Defs.' Suppl. Br. at 7. As the President in fact relied on the ITC report, the Government contends that the court must defer to his reasonable interpretation of the statute and accept that "on such basis" refers to the ITC report. Id.

The question before the court is not merely one of statutory interpretation. Rather, as noted above, the court may only set aside Presidential action where such action constitutes a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." Maple Leaf Fish Co., 762 F.2d at 89. Accordingly, the appropriate inquiry is not how the court would interpret the statute, but whether the President's interpretation of the statute was a "clear misconstruction" warranting judicial intervention.

The court concludes that it was not. As the Government notes, the President's determination of positive adjustment on the basis of the ITC report is at least plausibly supported by the statutes as a whole. First, "such" is typically read to "refer[ ] back to something indicated earlier in the text,"

which disfavors Plaintiffs' view that the basis referred to is the industry's positive adjustment. Defs.' Reply at 21–22. Second, a determination made on the basis of the ITC report would reflect "the views of an independent body based on information and argument provided by all market participants," and would therefore align with the Section 204(b)(1)(B)'s overall aim of permitting the adjustment of safeguard measures when the industry as a whole begins to adapt to competition. Defs.' Suppl. Br. at 7. The President's reading of the statute is not the only possible interpretation of "on such basis." Nevertheless, neither is it so implausible as to amount to a clear misconstruction.

Even in the event that the correct referent of "such basis" under Section 204(b)(1)(B) is, as Plaintiffs contend, "that the domestic industry has made a positive adjustment to import competition," there is likely no basis to set aside Proclamation 10101. Plaintiffs argue that the correct interpretation of "such basis" requires that the petition submitted to the president include a request for modification on the basis of positive adjustment. Pls.' Resp. at 16. Failure to satisfy such a requirement **\*1336** would therefore be an interpretive error by the representatives of domestic industry, rather than the President -- and would result in a flawed petition. As discussed above, the Federal Circuit has previously recognized that, where there is nothing in the statute that "prohibit[s] the President from approving recommendations that are procedurally flawed," procedural inadequacies in recommendations provided to the President do not provide a basis for rejecting the resultant Presidential action. See Silfab, 892 F.3d at 1347 (quoting Dalton v. Specter, 511 U.S. 462, 476, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994)). Indeed, "a recommendation does not cease to be made 'under' [the relevant] section ... simply because the recommendation is assertedly contrary to the substantive requirements of that provision." Id. (quoting Michael Simon Design, Inc. v. United States, 609 F.3d 1335, 1341 (Fed. Cir. 2010)). Even under Plaintiffs' interpretation of the statute, as in Silfab, there is no requirement in Section 204 precluding the President's acceptance of a flawed petition. Accordingly, even if the appropriate referent of "on such basis" under Section 204(b)(1)(B) were "the domestic industry has made a positive adjustment to import competition," the failure of petitioners to comply with this requirement would not render Proclamation 10101 unlawful.

### B. The President's Determination.

Finally, Plaintiffs allege that the President failed to comply with the procedural requirements of Section 204(b)(1)(B) by determining in Proclamation 10101 that the domestic industry "has begun to make" a positive adjustment to import competition, rather than "has made" such a positive adjustment. Pls.' Resp. at 21–23. The Government rejects Plaintiffs' argument that there is a meaningful distinction between "has made" and "has begun to make" which would invalidate the President's action under Section 204. Defs.' Reply at 22–24.

The court agrees with the Government. The phrase "has made a positive adjustment" in the statute is broad enough to include the finding that the domestic industry "has begun to make a positive adjustment" contained in the proclamation. For their argument to succeed, Plaintiffs must demonstrate a "clear misconstruction of the governing statute," Silfab, 892 F.3d at 1346, and the distinction between "has made" and "has begun to make" is too narrow to rise to the level of a clear misconstruction. Accordingly, the court rejects Plaintiffs' arguments with respect to the President's procedural compliance with the statute.

### II. Proclamation 10101 Does Not Violate Section 203(e) (7) of the Trade Act

Plaintiffs next argue that Proclamation 10101 violates the timing provisions of Section 203(e)(7) of the Trade Act. Section 203(e)(7) prohibits new safeguard duties from being imposed on an article for at least "a period of 2 years beginning on the date on which the previous action terminates" imposed on that article was terminated. 19 U.S.C. § 2253(e)(7)(A)(ii).[6] *1337 Plaintiffs contend that Proclamation 10101 violates this section because (1) bifacial solar panels are "articles" for the purposes of Section 203, and (2) the exclusion granted by USTR constitutes the termination of a safeguard duty such that any re-imposition of duties on bifacial solar panels through withdrawal of that exclusion would violate the prohibition on new safeguard measures. Pls.' Resp. at 35. The Government argues that CSPV products generally are the "article" at issue in Section 203, and that the exclusion "did not 'terminate' the safeguard measure as to bifacial products' " but rather "modif[ied] the HTS provisions" created by Proclamation 9693 to exclude a specific product from the safeguard measure. Defs.' Resp. to the Court's Questions at 8.

The court concludes that the relevant article for purposes of Section 203's cooling-off period is CSPV products generally,

and not bifacial solar panels specifically. The word "article" in this section refers back to its use in Section 201, which establishes the President's authority to impose safeguard duties "[i]f the [ITC] determines ... that an article is being imported in the United States in such increased quantities as to be a substantial cause of serious injury." 19 U.S.C. § 2251(a). Here, the ITC determined that "crystalline silicon photovoltaic cells ... are being imported into the United States in such increased quantities as to be a substantial cause of injury to the domestic industry producing an article like or directly competitive with the imported article." Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products), Investigation No. TA-201-75, USITC Pub. 4739 (Nov. 2017) at 1. It is clear that the ITC considered the imported "article" at issue here to be all CSPV products, and not bifacial products specifically. Accordingly, the court finds that Section 203(c)(7)'s cooling-off period does not apply to bifacial panels specifically, but rather to CSPV products as a whole.[7]

The court further concludes that the exclusion of bifacial solar panels is not a "termination" for the purposes of Section 203(e)(7). The President in Proclamation 9693 authorized USTR to "exclude ... *1338 particular product[s] from the safeguard measure" and to "modify or terminate any such determination." Proclamation 9693, 83 Fed. Reg. at 3,544. The President did not, however, delegate the authority to terminate the safeguard measure, which is the action that would trigger the limitations of Section 203(e)(7). Accordingly, no action that would trigger Section 203(e)(7)'s cooling-off period -- i.e., a termination of a safeguard measure -- was undertaken through the issuance of the exclusion. Furthermore, interpreting the exclusion of bifacial panels as a termination of the safeguard measure with respect to a specific "article" would run counter to Congressional intent. First, as set out above, bifacial solar panels are not an article for purposes of Section 203. Second, as the Government notes, viewing a withdrawn exclusion as a termination subject to Section 203's two-year limitation on new safeguards would require a separate cooling-off period with respect to every excluded "article," which would in turn give rise to repeated "miniI-TC investigations into separate subsets of the original 'article' " as each excluded product became eligible for the re-imposition of safeguards. Defs.' Br. at 22. The Government asserts that "Congress did not intend such a piecemeal approach to the protections of the safeguard statute," and the court agrees. Id. For the reasons set forth above, the court therefore concludes that Proclamation 10101's withdrawal of the exclusion was not in violation of Section 203(7)(e).

### III. *Proclamation 10101 Does Not Violate Section 201 of the Trade Act*

The parties also dispute whether action taken under Section 201 of the Trade Act requires the President to weigh the economic and social benefits of the alterations in Proclamation 10101 against the costs. Section 201(a) imposes a requirement that the President weigh the costs and benefits of a safeguard measure before imposing it:

> If the United States International Trade Commission (hereinafter referred to in this part as the "Commission") determines under [Section 202(b)] of this title that an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article, the President, in accordance with this part, shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.

19 U.S.C. § 2251(a). The Government argues that the President's initial explicit weighing of the economic and social costs in Proclamation 9693 is sufficient to comply with the requirements of the statute,[8] and maintains that the weighing of economic and social costs is only expressly required under Section 201(a) and Section 203(a)(2) -- which govern the initial implementation of safeguard duties -- and not under Section 204, which governs the alterations at issue here. Defs.' Br. at 22–24. Therefore, according to the Government, "there is no statutory basis for appending additional requirements onto Section 204 determinations." Defs.' Reply at 33.

**\*1339** Plaintiffs, however, contend that this determination must be made for Proclamation 10101 as well. First, Plaintiffs argue that Proclamation 9693 weighed the costs and benefits of a different tariff rate: 15% in the fourth year, rather than 18%. Pls.' Resp. at 39–42. Second, Plaintiffs argue that all changes to safeguard duties require the President to weigh social and economic costs and benefits. Id. at 40. They maintain that the President acknowledged as much in Proclamation 9693, which read in part that changes could be made "to facilitate efforts by the domestic industry to make a positive adjustment to import competition and to provide greater economic and social benefits than costs." Id. at 40–41 (quoting Proclamation 9693, 83 Fed. Reg. at

3,542). Furthermore, Plaintiffs argue that Section 201 of the Trade Act, which contains the requirement to weigh social and economic costs and benefits, provides "the overarching rule for safeguard duties," and therefore "sets the parameters for all actions taken pursuant to the entire safeguard statute," including the amendment of safeguard measures. Pls.' Reply at 21. They claim that the Government's interpretation of Section 204 "would create an exception ... that would swallow the rule," and therefore should be rejected. Id. (citing Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 389, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (rejecting statutory interpretation under which "the exception swallows the proviso and destroys its practical effectiveness")).

The court concludes that the President was required to weigh the costs and benefits of his alterations to the safeguards imposed by Proclamation 9693, and further concludes that the President met this requirement. On the first issue, the court agrees with Plaintiffs that failing to apply Section 201's requirement to weigh costs and benefits throughout the safeguard statute risks permitting absurd results, wherein "the President could impose a safeguard duty of one percent on certain CSPV products under Section 201 (after concluding that the costs of doing so did not outweigh the benefits), but then use Section 204 to increase the safeguard duty to 50 percent ... without ever considering whether the benefits of doing so exceed the costs." Pls.' Resp. at 41. Such a scenario would allow any Section 204 exception to swallow the Section 201 rule and would thus "destroy its practical effectiveness." Schwegmann 341 U.S. at 389, 71 S.Ct. 745. Accordingly, it is appropriate to read a baseline requirement to weigh social and economic costs and benefits into the statute as a whole.

With respect to the second issue, the court finds that the President considered, in compliance with the statute, the costs and benefits of his alterations to the safeguards imposed by Proclamation 9693. In Proclamation 10101 the President determined that "that the exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in Proclamation 9693," and that "the exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-year action I proclaimed in Proclamation 9693, and that to achieve the full remedial effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent." 85 Fed. Reg. at 65,640. By determining that the bifacial exclusion "impaired" the action

taken under Proclamation 9693, which was itself deemed necessary to "facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs," the President **\*1340** weighed the necessity of Proclamation 10101's alterations. Id.; see Proclamation 9693, 83 Fed. Reg. at 3,542. Furthermore, by referring back to the purpose of the safeguards issued by Proclamation 9693 and thus to that proclamation's express consideration of the economic and social costs and benefits of the safeguard measures, the President evinced his general consideration of the costs and benefits of the changes. As there is no requirement in either Section 201(a) or Section 204(b)(1)(B) that the President set forth his analysis in specific detail, the court concludes that the assessment of costs and benefits apparent here satisfies the statutory requirement.

### IV. *Proclamation 10101 Violates the Substantive Requirements of § 204(b)(1)(B) of the Trade Act*

Finally, Plaintiffs argue that Proclamation 10101 fails to comply substantively with Section 204(b)(1)(B) because it restricts, rather than liberalizes, trade. As set out above, Section 204(b) provides for the "reduction, modification, and termination" of a safeguard action, and specifically states that:

(1) Action taken under [Section 203] may be reduced, modified, or terminated by the President ... if the President—

[...]

(B) determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b)(1). The court concludes that, by interpreting "modification" to permit the expansion or upward adjustment of safeguard measures, Proclamation 10101 clearly misconstrues the meaning of the statute. Accordingly, Proclamation 10101's withdrawal of the exclusion must be set aside as a "clear misconstruction of the governing statute," resulting in "action outside delegated authority." Silfab, 892 F.3d at 1346 (quoting Maple Leaf Fish Co., 762 F.2d at 89).

Plaintiffs contend that only trade-liberalizing modifications are permitted under 204(b)(1)(B) because "[i]t runs counter to logic and congressional intent to increase trade restrictions

when 'the domestic industry has made a positive adjustment to import competition.' " Pls.' Resp. at 25 (emphasis in original). Plaintiffs further contend that in the Uruguay Round Agreement on Safeguards, Congress sought to implement existing United States law, and the fact that the resultant agreement only permits trade liberalizing modifications reflects the congressional intent that Section 204(b)(1)(B) also only permit trade liberalizing modifications. Id. at 27–28. Plaintiffs note that "[t]he [Statement of Administrative Action] further explains that '[t]he Uruguay Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from section 201. These include criteria regarding ... degressivity (progressive liberalization of safeguard restrictions).' " Id. (citing H.R. Rep. No. 103-316, 286, as reprinted in 1994 U.S.C.C.A.N. 4040, 4262). Accordingly, Plaintiffs argue, Proclamation 10101 should be set aside.

The Government claims that Section 204(b)(1)(B) is not limited to trade liberalizing measures, and in fact permits the President to increase safeguard duties. In support of their position they argue that, because safeguards may be reduced, modified, or terminated by the President under Section 204, reading modification to permit only "actions that reduce safeguard protections **\*1341** would make 'modification' coterminous with ... 'reduction', and therefore render 'modification' superfluous." Defs.' Br. at 13. The Government also cites to legislative history in support of their argument, noting that "an earlier Senate amendment stated that, upon receipt of the 'ITC monitoring report, the President may reduce, modify (but not increase), or terminate any action ....' " Id. at 14–15. The Government argues that the omission of the parenthetical "but not increase" in the final version of the act indicates that Congress intended to permit increases because "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." Russello v. United States, 464 U.S. 16, 23–24, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); see id. Accordingly, the Government argues, Proclamation 10101 is lawful under 204(b)(1)(B).

The question underlying this dispute is the meaning of "modify" as used in 204(b)(1)(B). How that question is resolved is informed by basic principles of statutory interpretation. See generally, Robert A. Katzmann, Judging Statutes (2014). The court begins with the principle that statutory language should be interpreted "in accord with the ordinary public meaning of its terms at the time

of its enactment." Bostock v. Clayton County, ––– U.S. ––––, 140 S. Ct. 1731, 1738, 207 L.Ed.2d 218 (2020). An appeal to the dictionary is therefore illustrative. In its verb form -- as it is used in 204(b)(1) -- "modify" is defined as "to make less extreme." See "Modify," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modify (last visited Nov. 9, 2021) Similarly, in its noun form -- as it is used in the section title, and in 204(b)(1)(B) -- "modification" is defined as "the limiting of a statement." See "Modification," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modification (last visited Nov. 9, 2021). Secondarily, "modification" is defined as "the making of a limited change in something." Id. The definition of the verb (as well as the first definition of the noun) favors Plaintiffs' interpretation: that the statute's provision for modification permits only changes that limit or moderate the existing safeguard measures. On the other hand, the second definition of "modification" favors the Government's interpretation: that both trade-liberalizing and trade-restricting changes to existing safeguard duties are authorized by the statute. Defs.' Resp. to the Court's Questions at 3.

Accordingly, the court turns next to the statute as a whole. Courts may look "to the broader structure of the [statute] to determine the meaning" of specific language. King v. Burwell, 576 U.S. 473, 492, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015). Where, as here, the terminology of the statute is ambiguous, it is all the more important to read disputed provisions "in their context and with a view to their place in the overall statutory scheme." Utility Air Reg. Grp. v. EPA, 573 U.S. 302, 311, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)).

Safeguard measures are intended to "facilitate efforts by the domestic industry to make a positive adjustment to import competition" while providing "greater economic and social benefits than costs." 19 U.S.C. § 2251(a). As Plaintiffs correctly note, "to strike that balance, the statute contains an intricate framework of investigations, consultations, reports, [and] weighing of factors." Pls.' Resp. at 26. This framework includes specific instructions for the investigation of alleged harms by the ITC, including the assessment of enumerated factors **1342 favoring a finding of serious injury and the holding of public hearings on both the risk of injury and proposed adjustment plans. 19 U.S.C. § 2252(b), (e). In order to ultimately authorize any safeguard measures, the President must also comply with a variety of interpretive and

substantive requirements, as well as specific deadlines for both further investigation and the proclamation of relief. See generally, 19 U.S.C. § 2253. The measures implemented go on to face both ongoing review and strict time limitations. 19 U.S.C. § 2253(e)(7); 2253(a).

Interpreting Section 204(b)(1)(B) to permit both trade-restricting and trade-liberalizing modifications would run counter to this detailed statutory scheme. Under such a view of the statute, the President would be permitted to increase safeguard measures without complying with the statutory requirements necessary to initially impose those safeguards. Adjustment of safeguard measures under 204(b)(1)(B) requires only that the President consider a midterm report by the ITC on the "developments with respect to the domestic industry, including the progress and specific efforts ... to make a positive adjustment to import competition." U.S.C. § 2254(a)(1)–(3), (b). There is no indication in the statute that Congress intended Section 204 to provide a loophole for the institution of harsher safeguards without the standard procedural restrictions. Conversely, there is every indication that the section was intended to provide an escape hatch from those safeguards where domestic industry has adequately adapted to import competition. Section 204(b)(1)(A), for example, contemplates that safeguards might be reduced or terminated where "the domestic industry has not made adequate efforts" to adjust to competition, or where "the effectiveness of the action ... has been impaired by changed economic circumstances" which "warrant ... reduction, or termination." 19 U.S.C. § 2254(b)(1)(A)(i)–(ii). The court therefore concludes that 204(b)(1)(B) must be read to authorize only trade-liberalizing modifications to safeguard measures, because interpreting the statute to permit trade-restricting modifications would undermine the broader statutory scheme. See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (citations omitted).

In light of the above, the court need not consider the legislative history arguments advanced by either side. See Bostock, 140 S. Ct. at 1749 ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.") (quoting Milner v. Department of Navy, 562 U.S. 562, 574, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011)). Even in the event, however, that the court did proceed to

consideration of the legislative history Plaintiffs still prevail, as that history is not decisive. For example, it is easy to imagine a scenario where a trade-liberalizing modification would require an "increase" of sorts (the President might increase a previously instituted quota) and the Government's arguments to the contrary are not dispositive.[9]

**\*1343** Because Section 204(b)(1)(B) permits only trade-liberalizing modifications to existing safeguard measures, the court concludes that Proclamation 10101's withdrawal of the exclusion of bifacial solar panels and increase of the safeguard duties on CSPV modules constituted both a clear misconstruction the statute and action outside the President's delegated authority. 85 Fed. Reg. at 65,640–42; Maple Leaf Fish Co., 762 F.2d at 89. This conclusion is rooted in the statutory scheme. That is not to say that, in another context, in a different statute, "modify" could not be read differently, or indeed as the Government argues. To be sure, Congress is free to revise the statute now before the court to permit upward modifications. Nevertheless, in this context, and without such revision of the law, the Government's argument cannot succeed. Accordingly, the court grants Plaintiffs' motion for summary judgment and finds that the proclamation must be set aside.

## CONCLUSION

Ultimately, while Proclamation 10101 complied with the procedural requirements of the safeguard statute, it nevertheless clearly misconstrued the reach of Section 204(b)(1)(B) of the Trade Act, and thus constituted an action outside the President's delegated authority. Neither the statute nor the statutory scheme supports interpreting Section 204(b)(1)(B) to permit increased restrictions on trade. Accordingly, the court grants Plaintiff's motion for summary judgment, and sets aside Proclamation 10101 on the basis that trade-restricting modifications are not permitted under the authority granted to the President by Section 204(b)(1)(B). The Government is enjoined from enforcing Proclamation 10101, including by modifying the Harmonized Tariff Schedule of the United **\*1344** States, and Plaintiff shall be refunded all safeguard duties collected pursuant to Proclamation 10101, with interest.

## SO ORDERED.

## All Citations

553 F.Supp.3d 1322

## Footnotes

1  For purposes of this opinion, the terms "solar modules" and "solar panels" are used interchangeably.

2  Prelim. Inj. Order and Op., Invenergy Renewables LLC v. United States, 43 CIT ——, 422 F. Supp. 3d 1255 (2019) ("Invenergy I"); Order and Op. Den. Mot. to Show Cause, id., 44 CIT ——, 427 F. Supp. 3d 1402 (2020) ("Invenergy II"); Order and Op. Den. Mot. to Dissolve Prelim Inj., Mots. to Dismiss and Granting Mot. to Suppl. Compl., id., 44 CIT ——, 450 F. Supp. 3d 1347 (2020) ("Invenergy III"); Order and Op. Den. Mot. to Dissolve Prelim Inj., Mot. to Stay, Granting Mot. to Modify Prelim. Inj., Mot. to Complete Administrative R., and Vacating USTR Decision, id., 44 CIT ——, 476 F. Supp. 3d 1323 (2020) ("Invenergy IV"); Order and Op. Den. Mot. to Modify Prelim. Inj., id., 44 CIT ——, 482 F. Supp. 3d 1344 (2020) ("Invenergy V").

3  Per the complaint, SEIA "is the national trade association for the U.S. solar industry, with hundreds of member companies ... throughout the solar value chain, including importers, manufacturers, distributors, installers, and project developers[;]" "NextEra is one of the largest electric power and energy infrastructure companies in North America and a leader in the renewable energy industry[;]" Invenergy Renewables, LLC, "is the world's leading independent and privately-held renewable energy company" [and] "develops, owns and operates large-scale renewable and other clean energy generation facilities around the world[;]" and EDF Renewables, Inc. "has more than 30 years of expertise in the renewable energy industry," with a focus on "wind, solar, energy storage and offshore wind." Compl., ¶¶ 7-9.

4  The parties agree that this is the first instance of the President employing 19 U.S.C. § 2254(b)(1)(B) to withdraw an exclusion. See Oral Argument, July 13, 2021, ECF No. 38; Pls.' Resp. to Oral Arg. Questions at 7, Jul. 9, 2021, ECF No. 36.

5  See About Us, Office of the U.S. Trade Representative, https://ustr.gov/about-us (last visited Nov. 9, 2021).

6  19 U.S.C. § 2253(e)(7) provides:

  (A) If an article was the subject of an action under subparagraph (A), (B), (C), or (E) of subsection (a)(3), no new action may be taken under any of those subparagraphs with respect to such article for—

(i) a period beginning on the date on which the previous action terminates that is equal to the period in which the previous action was in effect, or

(ii) a period of 2 years beginning on the date on which the previous action terminates, whichever is greater.

(B) Notwithstanding subparagraph (A), if the previous action under subparagraph (A), (B), (C), or (E) of subsection (a)(3) with respect to an article was in effect for a period of 180 days or less, the President may take a new action under any of those subparagraphs with respect to such article if—

(i) at least 1 year has elapsed since the previous action went into effect; and

(ii) an action described in any of those subparagraphs has not been taken with respect to such article more than twice in the 5-year period immediately preceding the date on which the new action with respect to such article first becomes effective.

7   Plaintiffs further argue that bifacial solar panels constitute an article for the purposes of 203(e)(7), and that failing to consider bifacial panels (rather than CSPV panels generally) a qualifying article would "allow safeguard duties to be immediately re-imposed on products following the termination of a safeguard measure as long as the domestic industry slightly modifies the definition of the article for which relief is sought." Pls.' Resp. at 35. Such a loophole, Plaintiffs contend, runs counter to the purpose of the statute. Pls.' Br. at 36. However, as Defendants expressly acknowledge in their responses to the court's questions before oral argument, "imposition of a safeguard measure against any subsequent entry of an overlapping product before the cooling-off period has passed would result [in] a 'new action ... taken ... with respect to such article'" and accordingly would be in violation of Section 203. Defs.' Resp. to the Court's Questions at 7–8 (quoting 19 U.S.C. § 2253(e)(7)(A)). As Plaintiffs' basis for deeming bifacial solar panels an article for purposes of the cooling-off period has therefore been mooted, the court declines to further address Plaintiffs' argument here.

8   The relevant portion of the proclamation reads, "I have determined that this safeguard measure will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs." Proclamation 9693, 83 Fed. Reg. at 3,542.

9   In support of its legislative history argument, the Government points primarily to the fact that "(but not increase)" was included in an earlier version of the statute in support of their position. Defs.' Reply at 28–29. And indeed, as already noted earlier in this opinion, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." Russello, 464 U.S. at 23–24, 104 S.Ct. 296 (citations omitted). This presumption, however, is not irrebuttable, and Plaintiffs offer convincing alternative explanations. Procedurally, Plaintiffs suggest the "but not increase" language was dropped as "a byproduct of combining different provisions addressing different situations using different language into a single provision." Pls.' Resp. to Oral Arg. Questions at 1–2. The "but not increase" language did not disappear during deliberations within a single house of Congress, but rather as a result of combining a similar provision from the Senate with one from the House. See H.R. Rep. No. 100-576, 687–88 (1988), as reprinted in 1988 U.S.C.C.A.N. 1547, 1720–21. This indicates that the deleted language may not carry the presumptive meaning argued for by the Government.

Practically, moreover, the "but not increase" language may have been deleted from the final version of the statute in order to give the President flexibility to make trade-liberalizing increases to existing safeguard duties. An increase in a quota, for example, would be a trade-liberalizing modification permitted under the operative language of Section 204(b)(1)(B) that would perhaps have been barred had the "but not increase" language not been deleted.

Furthermore, there is legislative history supporting Plaintiffs' view that "modify" should be read to permit only trade-liberalizing changes. In particular, the Uruguay Round Agreement on Safeguards, a multilateral treaty negotiated in the 1980s which only permits trade liberalizing modifications, was explicitly negotiated to reflect existing United States law. See H.R. Rep. No. 103–316, 286 (1994), as reprinted in 1994 U.S.C.C.A.N. at 4262 ("The Uruguay Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from section 201. These include criteria regarding ... degressivity (progressive liberalization of safeguard restrictions).") As such, the limitations on trade-restricting action incorporated in the Uruguay Round Agreement seem to reflect Congress's intent that the originating statute, including Section 204(b)(1)(B), also only permit trade-liberalizing modifications. Accordingly, even the legislative history supports Plaintiffs' view that "modify" only permits trade-liberalizing changes to safeguard measures.

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT 4

Judgment, ECF No. 44, Nov. 16, 2021, entered in Solar Energy Industries Ass'n et al. v. United States, Court No. 20-03941

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, and EDF RENEWABLES, INC.,**<br><br>        **Plaintiffs,**<br><br>    **v.**<br><br>**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, AND TROY A. MILLER, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF UNITED STATES CUSTOMS AND BORDER PROTECTION,**<br><br>        **Defendants.** | **Before:  Gary S. Katzmann, Judge**<br>**Court No. 20-03941** |

## <u>JUDGMENT</u>

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now, in conformity with that opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED** that Defendants' Motion to Dismiss is **DENIED**; and it is further

**ORDERED** that <u>Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products)</u>, 85 Fed. Reg. 65,639 (Oct. 16, 2020) ("<u>Proclamation 10101</u>") is **SET ASIDE** as null and void; and it is further

**ORDERED** that Customs and Border Protection shall refund with interest all increased safeguard duties heretofore collected from Plaintiffs under <u>Proclamation 10101</u>; and it is further

Court No. 20-003941                                                        Page 2

     **ORDERED** that Defendants and their agents are enjoined from taking any further action to effectuate or enforce <u>Proclamation 10101</u>.

     **SO ORDERED.**

<u>/s/   Gary S. Katzmann</u>
Gary S. Katzmann, Judge

Dated: <u>November 16, 2021</u>
     New York, New York

# ATTACHMENT 5

<u>Order</u>, ECF No. 47, Dec.7, 2021 entered in <u>Solar Energy Industries Ass'n et al. v.
United States</u>, Court No. 20-03941

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

_____
                                                            )
SOLAR ENERGY INDUSTRIES                  )
ASSOCIATION, NEXTERA ENERGY, INC.,       )
INVENERGY RENEWABLES LLC, and EDF         )
RENEWABLES, INC.,                         )
                                                            )
            Plaintiffs,                   )
                                                            )
    v.                                    )          Court No. 20-03941
                                                            )
UNITED STATES, UNITED STATESCUSTOMS       )
AND BORDER PROTECTION, AND TROY A.        )
MILLER, IN HIS OFFICIAL CAPACITY AS       )
ACTING COMMISSIONER OF UNITED             )
STATES CUSTOMS AND BORDER                 )
PROTECTION,                               )
                                                            )
            Defendants.                   )
_____)

# ORDER

Upon consideration of defendants' unopposed motion for an order to suspend liquidation

of all unliquidated entries of merchandise subject to the modifications to the safeguard measures

on crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other

products, imposed by *Proclamation 10101: To Further Facilitate Positive Adjustment to*

*Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not*

*Partially or Fully Assembled into Other Products)*, 85 Fed. Reg. 65,639 (Oct. 16, 2020)

(*Proclamation 10101*), it is hereby

ORDERED that defendants' motion is granted; and it is further

ORDERED that defendant, the United States, together with its delegates, officers, agents,

and servants, including employees of the U.S. Customs and Border Protection and Office of the

United States Trade Representative, is enjoined during the pendency of this litigation, including

any appeals, from issuing instructions to liquidate or making or permitting liquidation of any

entries of merchandise subject to the modifications to the safeguard measures on crystalline

silicon photovoltaic cells, whether or not partially or fully assembled into other products,

imposed by *Proclamation 10101* pending final and conclusive disposition of this action,

including all appeals.


/S/      Gary S. Katzmann
_____
JUDGE


Dated: December 7 , 2021
       New York, NY

# ATTACHMENT 6

U.S. Note 18 to Chapter 99, HTSUS Revision 2 (2022)

Case 1:22-cv-00321-N/A   Document 8   Filed 12/07/22   Page 55 of 75
**Harmonized Tariff Schedule of the United States Revision 2 (2022)**
Annotated for Statistical Reporting Purposes

CHAPTER 99

TEMPORARY LEGISLATION; TEMPORARY MODIFICATIONS ESTABLISHED
PURSUANT TO TRADE LEGISLATION; ADDITIONAL IMPORT RESTRICTIONS
ESTABLISHED PURSUANT TO SECTION 22 OF THE AGRICULTURAL
ADJUSTMENT ACT, AS AMENDED

XXII
99-1

U.S. Notes

1.     The provisions of this chapter relate to legislation and to executive and administrative actions pursuant to duly constituted authority, under which:

　　a.     One or more of the provisions in chapters 1 through 98 are temporarily amended or modified; or.

　　b.     Additional duties or other import restrictions are imposed by, or pursuant to, collateral legislation.

2.     Unless the context requires otherwise, the general notes and rules of interpretation, the section notes, and the notes in chapters 1 through 98 apply to the provisions of this chapter.

Statistical Notes

1.     For statistical reporting of merchandise provided for herein:

　　a.     Unless more specific instructions appear in the subchapters of this chapter, report the 8-digit heading or subheading number (or 10-digit statistical reporting number, if any) found in this chapter in addition to the 10-digit statistical reporting number appearing in chapters 1 through 97 which would be applicable but for the provisions of this chapter; and

　　b.     The quantities reported should be in the units provided in chapters 1 through 97.

2.     For those headings and subheadings herein for which no rate of duty appears (i.e., those headings and subheadings for which an absolute quota is prescribed), report the 8-digit heading or subheading number herein followed by the appropriate 10-digit statistical reporting number from chapters 1 through 97. The quantities reported should be in the units provided in chapters 1 through 97.

---

# **NOTICE TO EXPORTERS**

The statistical reporting numbers contained in this chapter apply only to imports and may not be reported on Shipper's Export Declarations. See Notice to Exporters preceding chapter 1.

---

Case 1:22-cv-00321-N/A   Document 8   Filed 12/07/22   Page 56 of 75
**Harmonized Tariff Schedule of the United States Revision 2 (2022)**
Annotated for Statistical Reporting Purposes

XXII
99 - III - 11

<u>U.S. Notes</u> (con.)

18. (a)   Subheadings 9903.45.21 through 9903.45.25 and any superior texts thereto establish temporary modifications applicable to entries of goods described herein and classified in the enumerated provisions of chapter 85 of the tariff schedule. Whenever any such subheading specifies that the annual aggregate quantity of such goods shall not exceed the quantity established under the terms of this note, when such goods are not the product of a country enumerated in subdivision (b) of this note, any entry of such goods that is in excess of the quantity specified for such provision shall be entered under the over-quota subheading set forth herein for such goods. All such goods shall be subject to duty as provided herein; and such duties shall be cumulative and imposed in addition to the rate of duty established for any such goods in chapter 85 of the tariff schedule, except as may be specified for duties imposed under the Rates of Duty 2 column.

   (b)   For the purposes of this note and the application of subheadings 9903.45.21 through 9903.45.25, inclusive, the following developing countries that are members of the World Trade Organization shall not be subject to the rates of duty and tariff-rate quotas provided for therein: Afghanistan, Albania, Algeria, Angola, Armenia, Azerbaijan, Belize, Benin, Bhutan, Bolivia, Bosnia and Herzegovina, Botswana, Brazil, Burkina Faso, Burma, Burundi, Cambodia, Cameroon, Cape Verde, Central African Republic, Chad, Comoros, Congo (Brazzaville), Congo (Kinshasa), Côte d'Ivoire, Djibouti, Dominica, Ecuador, Egypt, Eritrea, Ethiopia, Fiji, Gabon, The Gambia, Georgia, Ghana, Grenada, Guinea, Guinea-Bissau, Guyana, Haiti, Indonesia, Iraq, Jamaica, Jordan, Kazakhstan, Kenya, Kiribati, Kosovo, Kyrgyzstan, Lebanon, Lesotho, Liberia, Madagascar, Malawi, Maldives, Mali, Mauritania, Mauritius, Moldova, Mongolia, Montenegro, Mozambique, Namibia, Nepal, Niger, Nigeria, North Macedonia, Pakistan, Papua New Guinea, Paraguay, Rwanda, Saint Lucia, Saint Vincent and the Grenadines, Samoa, Sao Tomé and Principe, Senegal, Serbia, Sierra Leone, Solomon Island, Somalia, South Africa, South Sudan, Sri Lanka, Suriname, Swaziland [Eswatini], Tanzania, Timor-Leste, Togo, Tonga, Tunisia, Tuvalu, Uganda, Ukraine, Uzbekistan, Vanuatu, Yemen (Republic of), Zambia and Zimbabwe.

   (c) (i)   For the purposes of subheadings 9903.45.21 and 9903.45.22, except as otherwise provided herein, the term "crystalline silicon photovoltaic cells" ("CSPV cells") means crystalline silicon photovoltaic cells of a thickness equal to or greater than 20 micrometers, having a p/n junction (or variant thereof) formed by any means, whether or not the cell (or subassemblies thereof provided for in subheading 8541.42.00 and imported under statistical reporting number 8541.42.0010) has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell. Such cells include photovoltaic cells that contain crystalline silicon in addition to other photovoltaic materials. This includes, but is not limited to, passivated emitter rear contact cells, heterojunction with intrinsic thin-layer cells, and other so-called hybrid cells. Subheadings 9903.45.21 and 9903.45.22 include goods presented in cell form and which at the time of importation are not presented assembled into circuits, laminates or modules or made up into panels.

      (ii)   Subheadings 9903.45.21 and 9903.45.22 shall not cover-

         (1)   thin film photovoltaic products produced from amorphous silicon ("a-Si"), cadmium telluride ("CdTe"), or copper indium gallium selenide ("CIGS");

         (2)   CSPV cells, not exceeding 10,000 mm$^2$ in surface area, that are permanently integrated into a consumer good whose primary function is other than power generation and that consumes the electricity generated by the integrated CSPV cell. Where more than one CSPV cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all CSPV cells that are integrated into the consumer good; and

         (3)   CSPV cells, whether or not partially or fully assembled into other products, if such CSPV cells were manufactured in the United States.

      (iii)   Subheading 9903.45.25 shall not cover the following goods, whether or not separate statistical reporting numbers therefor may appear in chapters 1 through 97 of the tariff schedule:

         (1)   10 to 60 watt, inclusive, rectangular solar panels, where the panels have the following characteristics: (A) length of 250 mm or more but not over 482 mm or width of 400 mm or more but not over 635 mm, and (B) surface area of 1000 cm$^2$ or more but not over 3,061 cm$^2$), provided that no such panel with those characteristics shall contain an internal battery or external computer peripheral ports at the time of entry;

         (2)   1 watt solar panels incorporated into nightlights that use rechargeable batteries and have the following dimensions: 58 mm or more but not over 64 mm by 126 mm or more but not over 140 mm;

         (3)   2 watt solar panels incorporated into daylight dimmers, that may use rechargeable batteries, such panels with the following dimensions: 75 mm or more but not over 82 mm by 139 mm or more but not over 143 mm;

         (4)   off-grid and portable CSPV panels, whether in a foldable case or in rigid form containing a glass cover, where the panels have the following characteristics:

Case 1:22-cv-00321-N/A   Document 8   Filed 12/07/22   Page 57 of 75
Harmonized Tariff Schedule of the United States Revision 2 (2022)
Annotated for Statistical Reporting Purposes

XXII
99 - III - 12

<u>U.S. Notes</u> (con.)

(A)   a total power output of 100 watts or less per panel;

(B)   a maximum surface area of 8,000 cm$^2$ per panel;

(C)   do not include a built-in inverter;

(D)   where the panels have glass covers, such panels must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport);

(5)   3.19 watt or less solar panels, each with length of 75 mm or more but not over 266 mm and width of 46 mm or more but not over 127 mm, with surface area of 338 cm$^2$ or less, with one black wire and one red wire (each of type 22 AWG or 24 AWG) not more than 206 mm in length when measured from panel edge, provided that no such panel shall contain an internal battery or external computer peripheral ports;

(6)   27.1 watt or less solar panels, each with surface area less than 3,000 cm$^2$ and coated across the entire surface with a polyurethane doming resin, the foregoing joined to a battery charging and maintaining unit, such unit which is an acrylonitrile butadiene styrene ("ABS") box that incorporates a light emitting diode ("LED") by coated wires that include a connector to permit the incorporation of an extension cable.

(7)   off-grid, 45 watt or less solar panels, each with length not exceeding 950 mm and width of 100 mm or more but not over 255 mm, with a surface area of 2,500 cm2 or less, with a pressure-laminated tempered glass cover at the time of entry but not a frame, electrical cables or connectors, or an internal battery;

(8)   4 watt or less solar panels, each with a length or diameter of 70 mm or more but not over 235 mm, with a surface area not exceeding 539 cm2, and not exceeding 16 volts, provided that no such panel with these characteristics shall contain an internal battery or external computer peripheral ports at the time of entry;

(9)   solar panels with a maximum rated power of equal to or less than 60 watts, having the following characteristics, provided that no such panel with those characteristics shall contain an internal battery or external computer peripheral ports at the time of entry: (A) Length of not more than 482 mm and a width of not more than 635 mm or (B) a total surface area not exceeding 3,061 cm2;

(10)   flexible and semi-flexible off-grid solar panels designed for use with motor vehicles and boats, where the panels range in rated wattage from 10 to 120 watts, inclusive;

(11)   frameless solar panels in a color other than black or blue with a total power output of 90 watts or less where the panels have a uniform surface without visible solar cells or busbars;

(12)   solar cells with a maximum rated power between 3.4 and 6.7 watts, inclusive, having the following characteristics: (A) A cell surface area between 154 cm2and 260 cm2, inclusive, (B) no visible busbars or gridlines on the front of the cell, and (C) more than 100 interdigitated fingers of tin-coated solid copper adhered to the back of the cell, with the copper portion of the metal fingers having a thickness of greater than 0.01 mm;

(13)   solar panels with a maximum rated power between 320 and 500 watts, inclusive, having the following characteristics: (A) Length between 1,556 mm and 2,070 mm inclusive, and width between 1,014 mm and 1,075 mm, inclusive, (B) where the solar cells comprising the panel have no visible busbars or gridlines on the front of the cells, and (C) the solar cells comprising the panel have more than 100 interdigitated fingers of tin-coated solid copper adhered to the back of the cells, with the copper portion of the metal fingers having thickness greater than 0.01 mm;

(14)   modules (as defined in note 18(g) to this subchapter) incorporating only CSPV cells that are products of the United States and not incorporating any CSPV cells that are the product of any other country.

(15)   flexible fiberglass solar panels without glass components other than fiberglass, such panels having power outputs ranging from 250 to 900 watts;

(16)   solar panels consisting of solar cells arranged in rows that are laminated in the panel and that are separated by more than 10 mm, with an optical film spanning the gaps between all rows that is designed to direct sunlight onto the solar cells, and not including panels that lack said optical film or only have a white or other backing layer that absorbs or scatters sunlight;

(17)   bifacial solar panels that absorb light and generate electricity on each side of the panel and that consist of only bifacial solar cells that absorb light and generate electricity on each side of the cells.

Case 1:22-cv-00321-N/A   Document 8   Filed 12/07/22   Page 58 of 75
**Harmonized Tariff Schedule of the United States Revision 2 (2022)**
Annotated for Statistical Reporting Purposes

XXII
99 - III - 13

<u>U.S. Notes</u> (con.)

(d)     Any goods covered by this note may also be excluded from the application of relief if they are covered by a determination by the United States Trade Representative ("USTR") published in the Federal Register that such goods should be exempt from the application of any rate of duty or tariff-rate quota otherwise imposed on goods described in the provisions of this note. Such a determination by the USTR under this subdivision may exempt specific additional CSPV cells or modules when entered from all countries or when entered from enumerated countries only, or may modify the product descriptions in subdivision (c) of this note. The USTR is authorized to modify or terminate any such determination during the effective period of the subheadings specified in the first sentence of subdivision (a) of this note and to specify, subsequent to the effective date specified in this note, that such CSPV cells and modules will be considered "goods excluded from the application of relief" upon publication by the USTR of a notice in the Federal Register. Such "goods excluded from the application of relief" shall not be counted toward any tariff-rate quota quantities specified for any quota period.

(e)  (i)     For purposes of subheading 9903.45.21, the aggregate annual quantity of goods eligible to enter during any period enumerated herein shall not exceed the volume level set forth in such subheading, where 1 gigawatt equals 1,000 megawatts.

    (ii)    Any importer entering CSPV cells under subheading 9903.45.21 shall report the electricity power output attributable to such cells to the satisfaction of U.S. Customs and Border Protection ("Customs") and shall provide such information as Customs may require in order to permit the administration of this subheading. Such an entry shall constitute a certification by that importer of the power output attributable to the CSPV cells described therein. Importers are likewise directed to report the electricity power output attributable to CSPV cells entered under subheading 9903.45.22 to the extent that and in such form as Customs may require.

(f)     For purposes of subheading 9903.45.22 to this subchapter, the duty rate in the Rates of Duty 1-General subcolumn and the Rates of Duty 2 column for all goods entered under such subheading, and not the product of a country enumerated in subdivision (b) of this note, shall be as follows, with the duty rates set forth herein applied in addition to those applicable under subheading 8541.42.00:

            If entered during the period from
            February 7, 2018 through February 6, 2019....................................................30%
            If entered during the period from
            February 7, 2019 through February 6, 2020....................................................25%
            If entered during the period from
            February 7, 2020 through February 6, 2021 ..................................................20%
            If entered during the period from
            February 7, 2021 through February 6, 2022 ..................................................18%
            If entered during the period from
            February 7, 2022 through February 6, 2023 ..................................................14.75%
            If entered during the period from
            February 7, 2023 through February 6, 2024 ..................................................14.5%
            If entered during the period from
            February 7, 2024 through February 6, 2025 ..................................................14.25%
            If entered during the period from
            February 7, 2025 through February 6, 2026 ..................................................14%

(g)     Subject to the provisions of subdivision (c)(iii) of this note, for purposes of subheading 9903.45.25 to this subchapter, the term "modules" shall include the following goods provided for in subheading 8541.43.00 of the tariff schedule: a module is a joined group of CSPV cells, as such cells are defined in subdivision (c) of this note, regardless of the number of cells or the shape of the joined group, that are capable of generating electricity. Also included as a "module" are goods each known as a "panel" comprising a CSPV cell that has undergone any processing, assembly, or interconnection (including, but not limited to, assembly into a laminate). Such CSPV cells assembled into modules or made up into panels include goods of a type reported for statistical purposes under statistical reporting number 8541.43.0010. Such goods also include (i) CSPV cells which are presented attached to inverters or batteries of subheading 8501.80.10 or 8507.20.80, respectively; and (ii) CSPV cells classifiable as DC generators of subheading 8501.71.00 or 8501.72.10.

Case 1:22-cv-00321-N/A   Document 8   Filed 12/07/22   Page 59 of 75
**Harmonized Tariff Schedule of the United States Revision 2 (2022)**
Annotated for Statistical Reporting Purposes

XXII
99 - III - 14

U.S. Notes (con.)

(h)     For purposes of subheading 9903.45.25 to this subchapter, the duty rate in the Rates of Duty 1-General subcolumn and the Rates of Duty 2 column in any of the periods enumerated below shall be as follows, with the duty rates set forth herein applied in addition to those applicable under subheading 8541.43.00:

| | |
|---|---|
| If entered during the period from | |
| February 7, 2018 through February 6, 2019 | 30% |
| If entered during the period from | |
| February 7, 2019 through February 6, 2020 | 25% |
| If entered during the period from | |
| February 7, 2020 through February 6, 2021 | 20% |
| If entered during the period from | |
| February 7, 2021 through February 6, 2022 | 18% |
| If entered during the period from | |
| February 7, 2022 through February 6, 2023 | 14.75% |
| If entered during the period from | |
| February 7, 2023 through February 6, 2024 | 14.5% |
| If entered during the period from | |
| February 7, 2024 through February 6, 2025 | 14.25% |
| If entered during the period from | |
| February 7, 2025 through February 6, 2026 | 14% |

Such duty shall be imposed on the declared value of such modules, including the cost or value of the non-cell portions thereof (such as aluminum frames), as Customs in its regulations or instructions may require.

19. (a)     This note and the tariff provisions referred to herein set forth the ordinary customs duty treatment applicable to all entries of the aluminum products of all countries other than of the United States, when such aluminum products are classifiable in the headings or subheadings described in subdivision (a)(iii) or (a)(iv) or enumerated in subdivision (b) of this note. All anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein.

(i)     Except as provided elsewhere in this note, heading 9903.85.01 provides the ordinary customs duty treatment of aluminum products of all countries other than products of the United States and other than of countries expressly exempt therefrom, pursuant to the article description of such heading. For any such products that are eligible for special tariff treatment under any of the free trade agreements or preference programs listed in general note 3(c)(i) to the tariff schedule, the duty provided in this heading shall be collected in addition to any special rate of duty otherwise applicable under the appropriate tariff subheading, except where prohibited by law. Goods for which entry is claimed under a provision of chapter 98 and which are subject to the additional duties prescribed herein shall be eligible for and subject to the terms of such provision and applicable U.S. Customs and Border Protection ("CBP") regulations, except that duties under subheading 9802.00.60 shall be assessed based upon the full value of the imported article. No claim for entry or for any duty exemption or reduction shall be allowed for the aluminum products enumerated in subdivision (b) of this note under a provision of chapter 99 that may set forth a lower rate of duty or provide duty-free treatment, taking into account information supplied by CBP, but any additional duty prescribed in any provision of this subchapter or subchapter IV of chapter 99 shall be imposed in addition to the duty in heading 9903.85.01.

(ii)     Subheadings 9903.85.05 and 9903.85.06, inclusive, provide the ordinary customs duty and quota treatment of such goods enumerated in subdivision (b) of this note when they are the product of any country enumerated in the superior text thereto and expressly exempt from the scope of heading 9903.85.01, subject to the limitations in subdivision (e) of this note.

(iii)     Heading 9903.85.03 provides the ordinary customs duty treatment of the derivative aluminum products enumerated in this subdivision of all countries other than products of the United States and other than products of countries expressly exempted therefrom. For any products covered by heading 9903.85.03 that are eligible for special tariff treatment under any of the free trade agreements or preference programs listed in general note 3(c)(i) to the tariff schedule, the duty provided in heading 9903.85.03 shall be collected in addition to any special rate of duty otherwise applicable under the appropriate tariff subheading, except where prohibited by law. Goods for which entry is claimed under a provision of chapter 98 and which are subject to the additional duties prescribed herein shall be eligible for and subject to the terms of such provisions and applicable CBP regulations, except that duties under subheading 9802.00.60 shall be assessed based upon the full value of the imported article. No claim for entry or for any duty exemption or reduction shall be allowed for the derivative aluminum products enumerated in this subdivision under a provision of chapter 99 that may set forth a lower rate of duty or provide duty-free treatment, taking into account information supplied by CBP, but any additional duty prescribed in any provision of this subchapter or subchapter IV of chapter 99 shall be imposed in addition to the duty in heading 9903.85.03. Heading 9903.85.03 shall apply only to the following derivative aluminum products:

# ATTACHMENT 7

CSMS Message # 50263965, "Guidance: Section 201 Bifacial Solar Panels Court
Order on Presidential Proclamation 10101" (Dec. 2, 2021)



# CSMS #50263965 - Guidance: Section 201 Bifacial Solar Panels Court Order on Presidential Proclamation 10101

U.S. Customs and Border Protection sent this bulletin at 12/02/2021 02:52 PM EST



# Cargo Systems Messaging Service

## CSMS #50263965 - Guidance: Section 201 Bifacial Solar Panels Court Order on Presidential Proclamation 10101

The purpose of this message is to provide guidance on the U.S. Court of International Trade's (CIT) November 16, 2021, court order in CIT No. 20-03941 modifying the duty rate of the Section 201 safeguard tariff for solar cells and modules for the fourth year of the safeguard measure from 18 percent back to 15 percent, and reinstating the exclusion of bifacial solar panels from the safeguard.

### BACKGROUND

On October 10, 2020, the President issued Presidential Proclamation 10101: To Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products). See 85 FR 65639. Proclamation 10101 made two modifications to the Section 201 Action with regards to solar cells and panels: (1) The duty rate of the safeguard tariff for solar cells (over quota only) and modules for the fourth year of the safeguard measure was adjusted from 15 percent to 18 percent; and (2) The exclusion of bifacial solar panels from Section 201 safeguard tariff was revoked.

On November 16, 2021, the CIT issued a court order setting aside as null and void Proclamation 10101, modifying the duty rate of the Section 201 safeguard tariff for solar cells (over quota only) and modules for the fourth year of the safeguard measure from 18 percent back to 15 percent, and reinstating the exclusion of bifacial solar panels from the Section 201 safeguard tariff.

The functionality for the acceptance of solar cells (over quota only) and modules at the 15 percent duty rate under HTSUS 9903.45.22 and 9903.45.25 was available in the Automated Commercial Environment (ACE) as of 7 am eastern standard time, November 16, 2021.

### GUIDANCE

Importers entering bifacial solar panels that absorb light and generate electricity on each side of the panel and that consist of only bifacial solar cells that absorb light and generate electricity on each side of the cells should provide sufficient documentation to CBP to demonstrate the nature of the merchandise, including all relevant invoices and model numbers, as well as any other relevant information.  Supporting documentation for the bifacial solar panels should be uploaded into the Document Imaging Service (DIS), using entry number as the reference in DIS.

### ADDITIONAL INFORMATION

Questions related to the Section 201 safeguard should be sent to the appropriate Center at https://www.cbp.gov/trade/centers-excellence-and-expertise-information/cee-directory.



Update your subscriptions, modify your password or e-mail address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your e-mail address to log in. If you have questions or problems with the subscription service, please contact subscriberhelp.govdelivery.com.

This service is provided to you at no charge by U.S. Customs and Border Protection.

Privacy Policy | GovDelivery is providing this information on behalf of U.S. Department of Homeland Security, and may not use the information for any other purposes.

   

## Subscribe to updates from U.S. Customs and Border Protection

Email Address [                    ]   e.g. name@example.com

[ Subscribe ]

## Share Bulletin



Powered by

**GOVDELIVERY**

Privacy Policy | Cookie Statement | Help

# ATTACHMENT 8

<u>Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes</u>, 83 Fed. Reg. 3,541 (Jan. 23, 2018)

## Presidential Documents

Proclamation 9693 of January 23, 2018

## To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes

### By the President of the United States of America

### A Proclamation

1. On November 13, 2017, the United States International Trade Commission (ITC) transmitted to the President a report (the ''ITC Report'') on its investigation under section 202 of the Trade Act of 1974, as amended (the ''Trade Act'') (19 U.S.C. 2252), with respect to imports of certain crystalline silicon photovoltaic (CSPV) cells, whether or not partially or fully assembled into other products (including, but not limited to, modules, laminates, panels, and building-integrated materials) (''CSPV products''). These products exclude certain products described in the ITC Notice of Institution, 82 *FR* 25331 (June 1, 2017), and listed in subdivision (c)(ii) of Note 18 in Annex I to this proclamation.

2. The ITC reached an affirmative determination under section 202(b) of the Trade Act (19 U.S.C. 2252(b)) that CSPV products are being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or threat of serious injury, to the domestic industry producing a like or directly competitive article.

3. Pursuant to section 311(a) of the North American Free Trade Agreement Implementation Act (the ''NAFTA Implementation Act'') (19 U.S.C. 3371(a)), the ITC made findings as to whether imports from Mexico and Canada, considered individually, account for a substantial share of total imports and contribute importantly to the serious injury, or threat thereof, caused by imports. The ITC made affirmative findings of contribution to injury with respect to imports of CSPV products from Mexico but made negative findings with respect to imports of CSPV products from Canada.

4. On November 27, 2017, the United States Trade Representative (USTR) requested additional information from the ITC under section 203(a)(5) of the Trade Act (19 U.S.C. 2253(a)(5)). On December 27, 2017, the ITC provided a response that identified unforeseen developments that led to the importation of CSPV products into the United States in such increased quantities as to be a substantial cause of serious injury (the ''supplemental report'').

5. The ITC commissioners transmitted to the President their individual recommendations with respect to the actions that each of them considered would address the serious injury, or threat of serious injury, to the domestic industry and be most effective in facilitating the efforts of the industry to make a positive adjustment to import competition. The ITC did not recommend an action within the meaning of section 202(e) of the Trade Act (19 U.S.C. 2252(e)).

6. Pursuant to section 203 of the Trade Act (19 U.S.C. 2253), and after taking into account the considerations specified in section 203(a)(2) of the Trade Act (19 U.S.C. 2253(a)(2)), the ITC Report, and the supplemental report, I have determined to implement action of a type described in section 203(a)(3) of the Trade Act (19 U.S.C. 2252(a)(3)) (a ''safeguard measure''), with regard to the following CSPV products:

(a) solar cells, whether or not assembled into modules or made up into panels provided for in subheading 8541.40.60 in Annex I to this proclamation;

(b) parts or subassemblies of solar cells provided for in subheadings 8501.31.80, 8501.61.00, and 8507.20.80 in Annex I to this proclamation;

(c) inverters or batteries with CSPV cells attached provided for in subheadings 8501.61.00 and 8507.20.80 in Annex I to this proclamation; and

(d) DC generators with CSPV cells attached provided for in subheading 8501.31.80 in Annex I to this proclamation.

7. Pursuant to section 312(a) of the NAFTA Implementation Act (19 U.S.C. 3372(a)), I have determined after considering the ITC Report that imports of CSPV products from each of Mexico and Canada, considered individually, account for a substantial share of total imports and contribute importantly to the serious injury or threat of serious injury found by the ITC.

8. Pursuant to section 203 of the Trade Act, the action I have determined to take shall be a safeguard measure in the form of:

(a) a tariff-rate quota on imports of solar cells not partially or fully assembled into other products as described in paragraph 6 of this proclamation, imposed for a period of 4 years, with unchanging within-quota quantities and annual reductions in the rates of duty applicable to goods entered in excess of those quantities in the second, third, and fourth years, as provided in Annex I to this proclamation; and

(b) an increase in duties on imports of modules, imposed for a period of 4 years, with annual reductions in the rates of duty in the second, third, and fourth years, as provided in Annex I to this proclamation.

I have determined to exclude from this action the products listed in subdivision (c)(ii) and (c)(iii) of Note 18 in Annex I to this proclamation.

9. This safeguard measure shall apply to imports from all countries, except as provided in paragraph 10 of this proclamation.

10. This safeguard measure shall not apply to imports of any product described in paragraph 6 of this proclamation of a developing country that is a Member of the World Trade Organization (WTO), as listed in subdivision (b) of Note 18 in Annex I to this proclamation, as long as such a country's share of total imports of the product, based on imports during a recent representative period, does not exceed 3 percent, provided that imports that are the product of all such countries with less than 3 percent import share collectively account for not more than 9 percent of total imports of the product. If I determine that a surge in imports of a product described in paragraph 6 of this proclamation of a developing country that is a WTO Member results in imports of that product from that developing country exceeding either of the thresholds described in this paragraph, the safeguard measure shall be modified to apply to such product from such country.

11. The in-quota quantity in each year under the tariff-rate quota described in paragraph 8 of this proclamation shall be allocated among all countries except those countries the products of which are excluded from such tariff-rate quota pursuant to paragraph 10 of this proclamation.

12. Pursuant to section 203(a)(1)(A) of the Trade Act (19 U.S.C. 2253(a)(1)(A)), I have determined that this safeguard measure will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs. If I determine that further action is appropriate and feasible to facilitate efforts by the domestic industry to make a positive adjustment to import competition and to provide greater economic and social benefits than costs, or if I determine that the conditions under section 204(b)(1) of the Trade Act (19 U.S.C. 2254(b)(1)) are met, I shall reduce, modify, or terminate the action established in this proclamation accordingly. In addition, if I determine within 30 days of the date of this proclamation, as a result of consultations between the United States and other WTO Members pursuant to Article

12.3 of the WTO Agreement on Safeguards, that it is necessary to reduce, modify, or terminate the safeguard measure, I shall proclaim the corresponding reduction, modification, or termination of the safeguard measure within 40 days.

13. Section 502 of the Trade Act (19 U.S.C. 2462) authorizes the President to designate countries as beneficiary developing countries for purposes of the Generalized System of Preferences (GSP).

14. Proclamation 9687 of December 22, 2017, ended the suspension of Argentina's designation as a GSP beneficiary developing country. That proclamation made corresponding modifications to the Harmonized Tariff Schedule of the United States (HTS). Those modifications included technical errors, and I have determined that modifications to the HTS are necessary to correct them.

15. Section 604 of the Trade Act (19 U.S.C. 2483), authorizes the President to embody in the HTS the substance of the relevant provisions of that Act, and of other acts affecting import treatment, and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, acting under the authority vested in me by the Constitution and the laws of the United States, including but not limited to sections 203, 502, and 604 of the Trade Act, and section 301 of title 3, United States Code, do proclaim that:

(1) In order to establish increases in duty and a tariff-rate quota on imports of the CSPV products described in paragraph 6 of this proclamation (other than excluded products), subchapter III of chapter 99 of the HTS is modified as provided in Annex I to this proclamation. Any merchandise subject to the safeguard measure that is admitted into U.S. foreign trade zones on or after 12:01 a.m. eastern standard time on February 7, 2018, must be admitted as ''privileged foreign status'' as defined in 19 CFR 146.41, and will be subject upon entry for consumption to any quantitative restrictions or tariffs related to the classification under the applicable HTS subheading.

(2) Except as provided in clause (3) below, imports of CSPV products of WTO Member developing countries, as listed in subdivision (b) of Note 18 in Annex I to this proclamation, shall be excluded from the safeguard measure established in this proclamation. Imports of solar cells of those countries that are not partially or fully assembled into other products shall not be counted toward the tariff-rate quota limits that trigger the over-quota rates of duties.

(3) If, after the safeguard measure established in this proclamation takes effect, the USTR determines that:

(a) the share of total imports of the product of a country listed in subdivision (b) of Note 18 in Annex I to this proclamation exceeds 3 percent,

(b) imports of the product from all listed countries with less than 3 percent import share collectively account for more than 9 percent of total imports of the product, or

(c) a country listed in subdivision (b) of Note 18 in Annex I to this proclamation is no longer a developing country for purposes of this proclamation;

the USTR is authorized, upon publication of a notice in the *Federal Register,* to revise subdivision (b) of Note 18 in Annex I to this proclamation to remove the relevant country from the list or suspend operation of that subdivision, as appropriate.

(4) Within 30 days after the date of this proclamation, the USTR shall publish in the *Federal Register* procedures for requests for exclusion of a particular product from the safeguard measure established in this proclamation. If the USTR determines, after consultation with the Secretaries

of Commerce and Energy, that a particular product should be excluded, the USTR is authorized, upon publishing a notice of such determination in the *Federal Register,* to modify the HTS provisions created by Annex I to this proclamation to exclude such particular product from the safeguard measure described in paragraph 8 of this proclamation.

(5) In order to make technical corrections necessary to reflect the end of the suspension of Argentina's designation as a GSP beneficiary developing country, the HTS is modified as set forth in Annex II to this proclamation.

(6) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

(7) Except as provided for in clause (8) of this proclamation, the modifications to the HTS made by this proclamation, including Annex I, shall be effective with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 7, 2018, and shall continue in effect as provided in Annex I to this proclamation, unless such actions are earlier expressly reduced, modified, or terminated. Any modifications to the HTS made pursuant to clause (3) or (4) of this proclamation shall take effect as indicated in a *Federal Register* notice published in accordance with those clauses. One year from the termination of the safeguard measure established in this proclamation, the U.S. note and tariff provisions established in Annex I to this proclamation shall be deleted from the HTS.

(8) The modifications to the HTS set forth in Annex II to this proclamation shall be effective with respect to the articles entered, or withdrawn from warehouse for consumption, on or after the dates set forth in the relevant sections of Annex II.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-third day of January, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-second.

Billing code 3295–F8–P

## ANNEX I

## MODIFICATIONS TO CHAPTER 99 OF THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

Effective with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 7, 2018, and through 11:59 p.m. eastern standard time on February 6, 2022, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTS) is hereby modified by inserting in numerical sequence the following new U.S. note and provisions:

"18.  (a)    Subheadings 9903.45.21 through 9903.45.25 and any superior texts thereto establish temporary modifications applicable to entries of goods described herein and classified in the enumerated provisions of chapter 85 of the tariff schedule. Whenever any such subheading specifies that the annual aggregate quantity of such goods shall not exceed the quantity established under the terms of this note, when such goods are not the product of a country enumerated in subdivision (b) of this note, any entry of such goods that is in excess of the quantity specified for such provision shall be entered under the over-quota subheading set forth herein for such goods.  All such goods shall be subject to duty as provided herein; and such duties shall be cumulative and imposed in addition to the rate of duty established for any such goods in chapter 85 of the tariff schedule, except as may be specified for duties imposed under the Rates of Duty 2 column.

      (b)    For the purposes of this note and the application of subheadings 9903.45.21 through 9903.45.25, inclusive, the following developing countries that are members of the World Trade Organization shall not be subject to the rates of duty and tariff-rate quotas provided for therein:

          Afghanistan, Albania, Algeria, Angola, Armenia, Azerbaijan, Belize, Benin, Bhutan, Bolivia, Bosnia and Herzegovina, Botswana, Brazil, Burkina Faso, Burma, Burundi, Cambodia, Cameroon, Cape Verde, Central African Republic, Chad, Comoros, Congo (Brazzaville), Congo (Kinshasa), Côte d'Ivoire, Djibouti, Dominica, Ecuador, Egypt, Eritrea, Ethiopia, Fiji, Gabon, The Gambia, Georgia, Ghana, Grenada, Guinea, Guinea-Bissau, Guyana, Haiti, India, Indonesia, Iraq, Jamaica, Jordan, Kazakhstan, Kenya, Kiribati, Kosovo, Kyrgyzstan, Lebanon, Lesotho, Liberia, Macedonia, Madagascar, Malawi, Maldives, Mali, Mauritania, Mauritius, Moldova, Mongolia, Montenegro, Mozambique, Namibia, Nepal, Niger, Nigeria, Pakistan, Papua New Guinea, Paraguay, Rwanda, Saint Lucia, Saint Vincent and the Grenadines, Samoa, Sao Tomé and Principe, Senegal, Serbia, Sierra Leone, Solomon Island, Somalia, South Africa, South Sudan, Sri Lanka, Suriname, Swaziland, Tanzania, Timor-Leste, Togo, Tonga, Tunisia, Turkey, Tuvalu, Uganda, Ukraine, Uzbekistan, Vanuatu, Yemen (Republic of), Zambia and Zimbabwe.

      (c)   (i)    For the purposes of subheadings 9903.45.21 and 9903.45.22, except as otherwise provided herein, the term "crystalline silicon photovoltaic cells" ("CSPV cells") means crystalline silicon photovoltaic cells of a thickness equal to or greater than 20 micrometers, having a p/n junction (or variant thereof)

Annexes, page 2

formed by any means, whether or not the cell (or subassemblies thereof provided for in subheading 8541.40.60 and imported under statistical reporting number 8541.40.6030) has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell. Such cells include photovoltaic cells that contain crystalline silicon in addition to other photovoltaic materials. This includes, but is not limited to, passivated emitter rear contact cells, heterojunction with intrinsic thin-layer cells, and other so-called hybrid cells. Subheadings 9903.45.21 and 9903.45.22 include goods presented in cell form and which at the time of importation are not presented assembled into circuits, laminates or modules or made up into panels.

(ii)    Subheadings 9903.45.21 and 9903.45.22 shall not cover—

   (1)    thin film photovoltaic products produced from amorphous silicon ("a-Si"), cadmium telluride ("CdTe"), or copper indium gallium selenide ("CIGS");

   (2)    CSPV cells, not exceeding 10,000 $mm^2$ in surface area, that are permanently integrated into a consumer good whose primary function is other than power generation and that consumes the electricity generated by the integrated CSPV cell. Where more than one CSPV cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all CSPV cells that are integrated into the consumer good; and

   (3)    CSPV cells, whether or not partially or fully assembled into other products, if such CSPV cells were manufactured in the United States.

(iii)   Subheadings 9903.45.21 and 9903.45.22 shall likewise not cover the following goods, whether or not separate statistical reporting numbers therefor may appear in chapters 1 through 97 of the tariff schedule:

   (1)    10 to 60 watt, inclusive, rectangular solar panels, where the panels have the following characteristics: (A) length of 250 mm or more but not over 482 mm or width of 400 mm or more but not over 635 mm, and (B) surface area of 1000 $cm^2$ or more but not over 3,061 $cm^2$), provided that no such panel with those characteristics shall contain an internal battery or external computer peripheral ports at the time of entry;

   (2)    1 watt solar panels incorporated into nightlights that use rechargeable batteries and have the following dimensions: 58 mm or more but not over 64 mm by 126 mm or more but not over 140 mm;

   (3)    2 watt solar panels incorporated into daylight dimmers, that may use rechargeable batteries, such panels with the following dimensions:

Annexes, page 3

75 mm or more but not over 82 mm by 139 mm or more but not over 143 mm;

(4)   off-grid and portable CSPV panels, whether in a foldable case or in rigid form containing a glass cover, where the panels have the following characteristics:

  (A)   a total power output of 100 watts or less per panel;

  (B)   a maximum surface area of 8,000 cm$^2$ per panel;

  (C)   do not include a built-in inverter;

  (D)   where the panels have glass covers, such panels must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport);

(5)   3.19 watt or less solar panels, each with length of 75 mm or more but not over 266 mm and width of 46 mm or more but not over 127 mm, with surface area of 338 cm$^2$ or less, with one black wire and one red wire (each of type 22 AWG or 24 AWG) not more than 206 mm in length when measured from panel edge, provided that no such panel shall contain an internal battery or external computer peripheral ports;

(6)   27.1 watt or less solar panels, each with surface area less than 3,000 cm$^2$ and coated across the entire surface with a polyurethane doming resin, the foregoing joined to a battery charging and maintaining unit, such unit which is an acrylonitrile butadiene styrene ("ABS") box that incorporates a light emitting diode ("LED") by coated wires that include a connector to permit the incorporation of an extension cable.

(d)   Any goods covered by this note may also be excluded from the application of relief if they are covered by a determination by the United States Trade Representative ("USTR") published in the *Federal Register* that such goods should be exempt from the application of any rate of duty or tariff-rate quota otherwise imposed on goods described in the provisions of this note. Such a determination by the USTR under this subdivision may exempt specific additional CSPV cells or modules when entered from all countries or when entered from enumerated countries only, or may modify the product descriptions in subdivision (c) of this note. The USTR is authorized to modify or terminate any such determination during the effective period of the subheadings specified in the first sentence of subdivision (a) of this note and to specify, subsequent to the effective date specified in this note, that such CSPV cells and modules will be considered "goods excluded from the application of relief" upon publication by the USTR of a notice in the *Federal Register*. Such "goods excluded from the application of relief" shall not be counted toward any tariff-rate quota quantities specified for any quota period.

Annexes, page 4

(e)   (i)    For purposes of subheading 9903.45.21, the aggregate annual quantity of goods eligible to enter during any period enumerated herein shall not exceed the volume level set forth in such subheading, where 1 gigawatt equals 1,000 megawatts.

    (ii)    Any importer entering CSPV cells under subheading 9903.45.21 shall report the electricity power output attributable to such cells to the satisfaction of U.S. Customs and Border Protection ("Customs") and shall provide such information as Customs may require in order to permit the administration of this subheading. Such an entry shall constitute a certification by that importer of the power output attributable to the CSPV cells described therein. Importers are likewise directed to report the electricity power output attributable to CSPV cells entered under subheading 9903.45.22 to the extent that and in such form as Customs may require.

(f)    For purposes of subheading 9903.45.22 to this subchapter, the duty rate in the Rates of Duty 1-General subcolumn and the Rates of Duty 2 column for all goods entered under such subheading, and not the product of a country enumerated in subdivision (b) of this note, shall be as follows, with the duty rates set forth herein applied in addition to those applicable under subheading 8541.40.60:

         If entered during the period from
         February 7, 2018 through February 6, 2019 ..................................... 30%

         If entered during the period from
         February 7, 2019 through February 6, 2020 ..................................... 25%

         If entered during the period from
         February 7, 2020 through February 6, 2021 ..................................... 20%

         If entered during the period from
         February 7, 2021 through February 6, 2022 ..................................... 15%.

(g)    For purposes of subheading 9903.45.25 to this subchapter, the term "modules" shall include the following goods provided for in subheading 8541.40.60 of the tariff schedule: a module is a joined group of CSPV cells, as such cells are defined in subdivision (c) of this note, regardless of the number of cells or the shape of the joined group, that are capable of generating electricity. Also included as a "module" are goods each known as a "panel" comprising a CSPV cell that has undergone any processing, assembly, or interconnection (including, but not limited to, assembly into a laminate). Such CSPV cells assembled into modules or made up into panels include goods of a type reported for statistical purposes under statistical reporting number 8541.40.6020. Such goods also include (i) CSPV cells which are presented attached to inverters or batteries of subheading 8501.61.00 or 8507.20.80, respectively; and (ii) CSPV cells classifiable as DC generators of subheading 8501.31.80.

Annexes, page 5

(h)   For purposes of subheading 9903.45.25 to this subchapter, the duty rate in the Rates of Duty 1-General subcolumn and the Rates of Duty 2 column in any of the periods enumerated below shall be as follows, with the duty rates set forth herein applied in addition to those applicable under subheading 8541.40.60:

If entered during the period from
February 7, 2018 through February 6, 2019 ..................................... 30%

If entered during the period from
February 7, 2019 through February 6, 2020 ..................................... 25%

If entered during the period from
February 7, 2020 through February 6, 2021 ..................................... 20%

If entered during the period from
February 7, 2021 through February 6, 2022 ..................................... 15%.

Such duty shall be imposed on the declared value of such modules, including the cost or value of the non-cell portions thereof (such as aluminum frames), as Customs in its regulations or instructions may require.

| Heading/ Subheading | Article description | Rates of Duty | | |
| --- | --- | --- | --- | --- |
| | | 1 | | 2 |
| | | General | Special | |
| 9903.45.21 | Crystalline silicon photovoltaic cells, as defined in note 18(c) to this subchapter, when the product or originating good of a country other than a country described in note 18(b) to this subchapter: <br> If entered in an annual aggregate quantity not exceeding 2.5 gigawatts, under the terms of such note................................................................. | No change | No change | No change |
| 9903.45.22 | Other................................................................. | The duty rate provided in note 18(f) to this sub-chapter | | The duty rate provided in note 18(f) to this sub-chapter + 35% |

Annexes, page 6

| Heading/<br>Subheading | Article description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| 9903.45.25 | Modules as defined in note 18(g) to this subchapter, when the product or originating good of a country other than a country described in note 18(b) to this subchapter.............. | The duty rate provided in note 18(h) to this subchapter | | The duty rate provided in note 18(h) to this subchapter". |

Annexes, page 7

## ANNEX II

## MODIFICATIONS ON THE ELIGIBILITY OF CERTAIN ARTICLES THE PRODUCT OF ARGENTINA FOR PURPOSES OF THE GENERALIZED SYSTEM OF PREFERENCES

<u>Section A</u>. Effective with respect to articles entered, or withdrawn from warehouse for consumption, on or after January 1, 2018, general note 4(d) to the HTS is modified by:

(1) adding, in numerical sequence, the following subheading numbers and country set out opposite such subheading numbers:

| | | | |
|---|---|---|---|
| 0202.30.10 | Argentina | 1901.20.45 | Argentina |
| 0711.20.18 | Argentina | 2007.99.48 | Argentina |
| 1007.10.00 | Argentina | 2008.30.37 | Argentina |
| 1007.90.00 | Argentina | 2305.00.00 | Argentina |
| 1202.30.40 | Argentina | 2306.30.00 | Argentina |
| 1202.42.40 | Argentina | 4107.11.80 | Argentina |
| 1702.60.22 | Argentina | | |

(2) deleting from the numerical sequence, the following subheading number and country set out opposite such subheading number:

| | |
|---|---|
| 8523.29.50 | Argentina |

(3) adding, in alphabetical order, the country set out opposite the following subheadings:

| | |
|---|---|
| 1602.50.08 | Argentina |
| 1702.30.22 | Argentina |
| 2008.50.20 | Argentina |
| 3824.99.41 | Argentina |
| 3826.00.10 | Argentina |

<u>Section B</u>. Effective with respect to articles entered, or withdrawn from warehouse for consumption, on or after January 1, 2018, the HTS is modified as provided in this section. For each of the following subheadings, the Rates of Duty 1-Special subcolumn is modified by deleting the symbol "A" and inserting the symbol "A*" in lieu thereof:

| | |
|---|---|
| 0202.30.10 | 1901.20.45 |
| 0711.20.18 | 2007.99.48 |
| 1007.10.00 | 2008.30.37 |
| 1007.90.00 | 2305.00.00 |
| 1202.30.40 | 2306.30.00 |
| 1202.42.40 | 4107.11.80 |
| 1702.60.22 | |

[FR Doc. 2018–01592

Filed 1–24–18; 2: pm]

Billing code 7020–02–C